**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 06 C 4243 |
| | ) | |
| UAL CORPORATION, et al., | ) | Honorable John W. Darrah |
| | ) | |
| Reorganized Debtors. | ) | *Appeal from the United States* |
| | ) | *Bankruptcy Court for the Northern* |
| | ) | *District of Illinois, Eastern Division* |
| | ) | *Case No. 02-B-48191* |
| | ) | |
| | ) | *Hon. Eugene R. Wedoff* |
| | ) | |
| | ) | |
| | ) | |

---

**BRIEF OF APPELLANT GENERAL FOODS CREDIT CORPORATION**

---

David S. Curry (ARDC #6184327)
Robert A. Kelman (ARDC #1440470)
Jonathan D. Kron (ARDC #6190570)
John J. Voorhees, Jr. (ARDC #6209292)
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone:(312) 782-0600
Facsimile: (312) 701-7711

and

David Abbott (ARDC #3126754)
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019-5820
Telephone:(212) 506-2500
Facsimile: (212) 262-1910

*Attorneys for Appellant*

ORAL ARGUMENT REQUESTED                    August 24, 2006

1355603.5

# TABLE OF CONTENTS

**Page**

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES ............................................. (ii)

JURISDICTION ................................................................................................................. 1

QUESTIONS PRESENTED ............................................................................................... 1

STANDARD OF REVIEW ................................................................................................ 1

STATEMENT OF CASE AND SUMMARY OF ARGUMENT ...................................... 2

STATEMENT OF THE FACTS ........................................................................................ 5

    A.      The GFCC Leveraged Lease Transactions ............................................. 5

    B.      United's Rejection of the Leases ............................................................ 6

    C.      The GFCC TIA Claim ............................................................................ 6

    D.      Filing of GFCC's Proof of Claim for its TIA Claim .............................. 8

    E.      Treatment of Tax Savings Under the TIA .............................................. 9

    F.      GFCC is the Exclusive Holder of the TIA Claim ................................. 9

    G.      The TIA Claim is Not Duplicative of the Claims of the Indenture Trustee ........... 10

    H.      No Part of GFCC's TIA Claim Has in Fact Been Paid to the Indenture Trustees ...................................................................................................... 11

    I.      Objection to the TIA Claim and Bankruptcy Court's Ruling ................. 12

ARGUMENT ..................................................................................................................... 12

    A.      The Bankruptcy Court Ignored the TIA's Mandate to Maintain Net Economic Return ................................................................................... 13

    B.      The TIA Maintains Cash Flows After-Tax ............................................ 15

    C.      United's Offset Claim Violates the Maintenance of Net Economic Return ........... 16

    D.      Consideration of Tax Savings Is Expressly Conditioned on No Defaults by United ..................................................................................................... 17

    E.      Assignment of SLV to the Indenture Trustee Cannot Change the TIA Obligations ............................................................................................ 20

    F.      Summary ................................................................................................ 22

CONCLUSION .................................................................................................................. 23

APPENDIX

# TABLE OF CASES, STATUTES AND
# OTHER AUTHORITIES

## Cases

*American Express Bank Ltd. v. Uniroyal, Inc.*,
  562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990) .......................................................... 19

*Analisa Salon, Ltd. v. Elide Properties, LLC*,
  818 N.Y.S.2d 130 (N.Y. App. Div. 2006) ................................................................. 20

*Caisse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1272 (7th Cir. 1996) . 14

*Deutsche Bank AG v AMBAC Credit Prods., LLC*,
  2006 WL 1867497, *10 (S.D.N.Y. 2006) .................................................................. 20

*Gregory v. Simon & Schuster, Inc.*,
  1994 WL 381481 (S.D.N.Y. 1994) ........................................................................... 20

*HA-LO Indus., Inc. v. CenterPoint Props. Trust*,
  342 F.3d 794, 797 (7th Cir. 2003) ............................................................................. 2

*In re Belda*,
  315 B.R. 477, 481 (N.D. Ill. 2004) ............................................................................ 2

*Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (Ct. App. N.Y. 1971).... 14

*Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 212-213, 321 N.Y.S.2d 81, 269 N.E.2d 799 (Ct. App. N.Y. 1971) ............................................................................................................................. 14

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52, 63 (1995) ............................................................................................. 20

*Meyer v. Rigdon*,
  36 F.3d 1375, 1378 (7th Cir. 1994) ............................................................................ 1

## Statutes

11 U.S.C. §365 ................................................................................................................ 6

28 U.S.C. § 158 .............................................................................................................. 1

28 U.S.C. §§ 157 and 1334(b) ........................................................................................ 1

## Other Authorities

EQUIPMENT LEASING – LEVERAGED LEASING
  Chapter 29:6.4[B], Adjustment Process at pgs. 29-89 (Ian Shrank & Arnold G. Gough, Jr. eds.
  4th Ed., Vol. 3) ........................................................................................................... 7

## JURISDICTION

The Bankruptcy Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). The Bankruptcy's Court's July 7, 2006 order is "final" under 28 U.S.C. § 158. General Foods Credit Corporation ("GFCC") timely filed a notice of appeal on July 14, 2006. GFCC Appendix, Tab 17.[1] This Court has appellate jurisdiction under 28 U.S.C. § 158.

## QUESTIONS PRESENTED

1.     Whether the Bankruptcy Court erred in not allowing GFCC's tax indemnity claims against United Airlines, Inc. ("United") in an amount sufficient to preserve GFCC's "Net Economic Return,"[2] as specified in the tax indemnity agreements between United and GFCC.

2.     Whether the Bankruptcy Court erred in ordering that the amount of GFCC's tax indemnity claims must be reduced by an offset that is based on certain future tax savings, even though (i) United was in default of its obligations under the relevant agreements and (ii) as a result of that reduction, GFCC's claims were not allowed in an amount sufficient to maintain its Net Economic Return.

## STANDARD OF REVIEW

This Court reviews legal conclusions de novo and factual conclusions for clear error. *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994); *In re Belda*, 315 B.R. 477, 481 (N.D. Ill. 2004). At a hearing on January 6, 2006, United and GFCC agreed that United's objections to GFCC's tax indemnity claim, which are the subject of GFCC's appeal, raised questions of law that

---

[1]     All references herein to "GFCC App." are to the Appendix To General Foods Credit Corporation's Statement Of Issues On Appeal And Designation Of Items To Be Included In The Record On Appeal, which was filed with the United States Bankruptcy Court for the Northern District of Illinois on July 21, 2006.

[2]     All terms not otherwise defined herein shall have the meaning ascribed to them in the leases. Each of the leases and other operative documents referred to herein is substantively the same for the purposes of this appeal. A representative copy of one set of operative documents is attached as Group Exhibit A to the Response of General Foods Credit Corporation to Omnibus Objection to Aircraft and Tax Indemnity Claims. GFCC App., Tab 3 (Group Exhibit A), *Lease* §1 at 11.

did not require an evidentiary hearing.[3]  The Bankruptcy Court agreed.  GFCC App. at Tab 18, pg.

44.  Consistent with the foregoing positions of the parties and with the Bankruptcy Court's

observation, GFCC's appeal raises only questions of law related to the meaning of certain disputed

contractual provisions that should be reviewed by this Court *de novo*.  *HA-LO Indus., Inc. v.

CenterPoint Props. Trust*, 342 F.3d 794, 797 (7th Cir. 2003) (holding that issues of contractual

interpretation are questions of law that are reviewed *de novo*).

## STATEMENT OF CASE AND SUMMARY OF ARGUMENT

United has caused GFCC to incur unanticipated tax liabilities in connection with GFCC's

investment in the six aircraft leveraged leases that are the subject of this appeal.  United did so by

defaulting on the leases, which led to foreclosures against the aircraft beneficially owned by

GFCC.  The amount of the tax liabilities so incurred by GFCC is not in dispute.  United agreed to

indemnify GFCC for the losses resulting from such tax liabilities.  This indemnity is contained in a

separate tax indemnity agreement (a "TIA") for each leveraged lease, and it requires United to

"maintain" GFCC's Net Economic Return with respect to such tax liabilities.  GFCC App., Tab 3

(Group Exhibit A), *Tax Indemnity Agreement.*  As we address below, Net Economic Return is a

specialized yardstick of financial success typically used in leveraged lease transactions that

measures returns on an after-tax basis, i.e., considering all the non-tax and tax cash flows from the

investment.

GFCC filed claims against United in its Chapter 11 case, setting forth its claim for

indemnification under the TIAs (as more particularly defined below, the "TIA Claim").  United

objected to GFCC's TIA Claim, urging the Bankruptcy Court to allow certain offsets against the

---

[3]      Comments of United's counsel, Marc Kieselstein, Esq., GFCC App. at Tab 18, pgs 30-33.  Comments of
GFCC's counsel David Abbott, Esq., GFCC App. at Tab 18, pg. 38. *But see* GFCC App., Tab 19 at pgs. 93-94 where
the need for an evidentiary hearing on the so-called Gross-Up issue was discussed.

indemnity it owes.  GFCC App., Tabs 2 and 7.  The offset United requested would reduce GFCC's

TIA Claim by the amount of so-called "Tax Savings" that GFCC would supposedly realize in

future years.  However, the Tax Savings, as United defines them, pertain to taxes that were to be

paid by GFCC from rents United was scheduled to pay under the leases.  Due to its defaults,

United will never make the rent payments and so no offset for GFCC "saving" these taxes can be

given to United without violating the TIA's requirement that GFCC's Net Economic Return be

maintained.  Put differently, as a result of United's defaults, GFCC will be in a worse economic

position with respect to its tax liabilities; GFCC's Net Economic Return will be eroded, not

maintained.

In its June 23, 2006 Memorandum of Decision the Bankruptcy Court allowed United an

offset for Tax Savings.  GFCC App., Tab 15.  In so ruling, the Bankruptcy Court made at least

three fundamental errors in its interpretation of the TIA.  First, the Bankruptcy Court ignored the

unequivocal mandate of Section 5(b) of the TIA:  GFCC "shall" be paid an amount sufficient "to

cause [its] Net Economic Return to be maintained."  GFCC App., Tab 3 (Group Exhibit A), *Tax

Indemnity Agreement*.  Instead of giving effect to this clear language, the Bankruptcy Court

effectively rewrote the TIA, turning it into something far different than what was agreed to by the

parties.  Inexplicably, the Bankruptcy Court interpreted the requirement of maintaining Net

Economic Return as nothing more than "a cap" on what GFCC can recover.  GFCC App., Tab 15,

at pg. 7.  That interpretation is flatly contradicted by the language of the TIA.  Maintaining

GFCC's Net Economic Return is not a mere cap.  The language instead establishes an exact

standard for determining whether United has satisfied its indemnity obligations:  Has United paid

an amount sufficient to maintain GFCC's Net Economic Return?

Second, the Bankruptcy Court ignored an express provision in the TIA that clearly states that Tax Savings are not to be paid to United whenever United is in default, which includes the failure to pay future rents.[4] This provision is in harmony with the TIA's command that GFCC's Net Economic Return be maintained. Otherwise, United would escape its obligation to maintain Net Economic Return. And that is the exact effect of the Bankruptcy Court's ruling.

Third, the court erred in concluding that "other provisions" of the leveraged lease documents support United's claim for a Tax Savings offset. Apparently based on unfounded concerns about exposing United to duplicate claims, the Bankruptcy Court concluded that because the owner trusts utilized by GFCC to acquire the aircraft had issued notes to obtain a portion of the purchase price of the aircraft that were secured by an assignment of the rents under the lease, United's liability under the leases must be taken into account in determining United's liability under the TIA. GFCC App., Tab 15 at pg. 7. But nothing in the leveraged lease documents supports that conclusion. United's obligations to GFCC under the TIA stand as independent obligations, separate from the leases. They are owed solely to GFCC. In the circumstances present here, nothing in the TIA permits United to reduce its indemnity obligation based on its liability under the leases. In addition, the documents referenced by the Bankruptcy Court show the opposite to be the case. Section 8 of the TIA protects United from potential duplicate liability by providing that United can reduce its liability under the leases (by adjusting so-called "Stipulated Loss Value") to take into account payments made under the TIA.[5] Accordingly, GFCC requests

---

[4] GFCC App., Tab 3 (Group Exhibit A), *Tax Indemnity Agreement* at pg. 13 ("If, as a result of a Loss for which indemnification is paid by the Lessee hereunder, the Owner Participant shall recognize any Tax Savings not taken into account under Section 5(b) above in determining the amount payable to the Owner Participant under Section 5(b), then, *provided no Default or Event of Default shall have occurred and be continuing*, the Owner Participant shall pay to the Lessee an amount equal to the sum of such Tax Savings realized by the Owner Participant plus the amount of any Tax Savings Gross-Up.") (emphasis added).

[5] Moreover, as we discuss below, no duplication exists in the present case in any event, as established by an order of the Bankruptcy Court.

4

that this Court reverse the Bankruptcy Court's ruling and order that GFCC's claim be calculated

without any deduction for so-called Tax Savings.

## STATEMENT OF THE FACTS

### A.    The GFCC Leveraged Lease Transactions.

This appeal arises out of six aircraft leveraged lease transactions entered into in December

1992.  The agreements are governed by New York law.  GFCC App., Tab 3 (Group Exhibit A),

*Lease* §23, *TIA* §11*, Participation Agreement* §16(c), and *Indenture* §10.12.  As part of these

transactions, GFCC became the beneficial owner, through six owner trusts that hold legal title, of

six aircraft that were then leased to United by the owner trusts.  GFCC contributed to each owner

trust as an equity investment approximately 27 percent of the purchase price for the aircraft.  To

finance the balance of the investment in the aircraft, the Owner Trustee of each owner trust issued

non-recourse notes ("Notes") through a trust indenture ("Indenture") between the Owner Trustee

and the indenture trustee identified therein (the "Indenture Trustee").  The Owner Trustee

purchased the aircraft with the proceeds of GFCC's investment and the Notes and leased each

aircraft back to United under a long-term lease.[6]  The Owner Trustees' rights, as lessor, in each of

the aircraft and the related lease were pledged, except for items defined as Excluded Payments

under the lease, to the Indenture Trustees to secure payment of the Notes.

As we discuss below, GFCC's rights under the TIAs, which were entered into by GFCC

and United simultaneously with the other lease-related documents, were among the Excluded

Payments that were not pledged to the Indenture Trustee.  In addition, it is undisputed that GFCC's

---

[6]     Because the provisions of each lease that are relevant to this appeal are substantively the same, any reference
herein to a single lease or other individual leveraged lease agreement is applicable collectively to each of such
agreements.

claim under the TIA is entitled to the same priority as all other unsecured claims, including the claims of the Indenture Trustee for the pledged portion of rent and other rights under the lease.

The lease provides for periodic rents.  GFCC App., Tab 3 (Group Exhibit A), *Lease* §3 at pg. 18, Exhibit B.  However, in the event of a lease acceleration, such as resulted from United's default, the lease specifies various remedies, including a liquidated damages remedy in an amount commonly called Stipulated Loss Value or "SLV."  GFCC App., Tab 3 (Group Exhibit A), *Lease* §3(c), Exhibit C.  The SLV amounts set forth in the lease were sufficient to provide full payment of the Notes and also to pay GFCC's Net Economic Return.  However, as discussed below, the SLV amounts owed by United under the lease are expressly subject to downward adjustment in the event and to the extent Net Economic Return is paid directly to GFCC under the TIA.  GFCC App., Tab 3 (Group Exhibit A), *TIA* §8.

**B.      United's Rejection of the Leases.**

Following the filing of its chapter 11 case, United decided not to continue to perform the leases and ultimately rejected them pursuant to section 365 of the Bankruptcy Code.  11 U.S.C. §365.  It is undisputed that United has breached the leases.  As a result, the Indenture Trustees have exercised their remedies under the Indentures and have now foreclosed against the aircraft thereby eliminating GFCC's beneficial ownership therein.  GFCC App., Tab 15, pg. 3.

**C.      The GFCC TIA Claim.**

Pursuant to the TIA, United agreed to indemnify GFCC for its loss of Net Economic Return resulting from the reduction of tax benefits or unanticipated inclusions of taxable income.  Specifically, Section 5 of the TIA provides:

(b) Indemnity.  *The amount payable by reason of any Loss shall be a lump sum amount which, on an After-Tax Basis, shall cause the Owner Participant's Net Economic Return to be maintained* after taking into account the sum of the following amounts payable by the Owner Participant with respect to such Loss:

(A) the additional Federal and State income tax payable as a result of such Loss…. (*emphasis added*).

GFCC App., Tab 3 (Group Exhibit A), *TIA* §5.  As a result of the Indenture Trustee's foreclosure against the aircraft, GFCC suffered a realization of taxable gain from the foreclosure sale (which constitutes a loss of tax benefits or unanticipated inclusions of taxable income).  This triggered United's obligation under the TIA to indemnify GFCC in an amount sufficient to ensure that GFCC's Net Economic Return is maintained on an after-tax basis.

> Each lease defines Net Economic Return as follows:
>
> "Net Economic Return" means the Owner Participant's net *after-tax* book yield, [and] *aggregate after-tax* cash flow…utilizing the multiple investment sinking fund method of analysis *computed on the basis of the same methodology and assumptions as were utilized by the Owner Participant in determining Basic Rent,* Excess Amount, Stipulated Loss Value percentages…. (*emphasis added*).

GFCC App., Tab 3 (Group Exhibit A), *Lease* §1, pg. 11.  Net Economic Return, like its counterparts in other types of investments, is a measure of financial gain or success in a financial investment.  Thus, a loan is measured in terms of payments of interest on principal.  Other financial investments, such as an investment in real estate, may be measured by an Internal Rate of Return or "IRR."  The profitability and success of a leveraged lease investment in tangible personal property, such as the aircraft lease in question, is measured by the specialized concept of the owner participant's "Net Economic Return."  The term Net Economic Return is well recognized and understood in the leasing industry as expressing that which owner participants must maintain in order to obtain the benefit of their bargain.[7]

---

[7]     "Lessors usually want to protect after-tax yield, periodic cash flow, and accounting earnings and will express these items within the definition of 'net economic return' or a similar defined phrase. . ." EQUIPMENT LEASING – LEVERAGED LEASING Chapter 29:6.4[B], Adjustment Process at pgs. 29-89 (Ian Shrank & Arnold G. Gough, Jr. eds. 4th Ed., Vol. 3).  "The basic rent and termination values initially set forth in a lease are based on certain assumptions that will achieve for the lessor a certain economic yield, cash flow and accounting earnings." *Id*. at Chapter 29:6.4[A], Economic Assumptions at pgs. 29-87.

As the Bankruptcy Court accepted and United did not dispute, factored into the calculation of Net Economic Return are all of the owner participant's cash out-flows directly associated with the investment, including its upfront cash investment and fees and expenses. GFCC App., Tab 15, pg. 6. The Net Economic Return also takes into account all cash in-flows, including rent and all U.S. income tax cash flows available to GFCC by virtue of its ownership and investment in the leased asset. Typically, these tax cash flows include inflow from the tax benefits of depreciation and interest deductions but they also include the outflow from the income taxes payable on the rent or from taxable sales. It is the aggregate after-tax cash flows that must be maintained.

**D.      Filing of GFCC's Proof of Claim for its TIA Claim.**

On January 16, 2006, GFCC amended its proof of claim asserting a liquidated claim in the amount of $96,206,880.22 (Claim No. 44909) (the "Amended GFCC Claim"). GFCC App., Tab 23. Of that amount, $94,999,522.76 represented GFCC's claims against United under the TIAs (the "TIA Claim").[8]

The TIA Claim was calculated precisely in accordance with the provisions of the TIA. It began with the calculation of GFCC's taxable gain occasioned by foreclosure resulting from United's defaults. This taxable gain and the resulting tax liabilities constitute cash outflows which were not anticipated or assumed in the initial calculation of Net Economic Return and so they must be indemnified against in order to maintain Net Economic Return. The gain at the foreclosure sale equaled the balance of the outstanding Notes less any remaining tax basis in the aircraft. GFCC App., Tab 3 (Group Exhibit A), *TIA* §§2 (Tax Assumptions) and 5(b) (Indemnity). The taxable gain realized by GFCC upon foreclosure was multiplied by the tax rate specified in the TIA. There

---

[8]      The balance was a claim for reimbursement of fees and expenses, which was not based on the TIAs. That claim has been settled by the parties and is not relevant to the issues on appeal.

is no dispute over the amount of GFCC's taxable gain or the calculation of tax thereon due to the foreclosure sales, all of which have now occurred.

### E.      Treatment of Tax Savings Under the TIA.

Section 5(b) of the TIA provides that in addition to taking into account the tax loss, the calculation to maintain Net Economic Return also shall "take into account any Tax Savings reasonably expected to be available…."  The requirement to "take into account" Tax Savings does not override the mandate to maintain Net Economic Return, but rather is to be taken into account in ensuring that Net Economic Return is maintained.  As is made clear from the original pricing spreadsheets used in calculating Net Economic Return, these so-called "saved" future taxes were expected to be paid with aggregate cash flows available from future rents, not from additional investment by GFCC.  *See* GFCC App., Tab 6 at Exhibit A.

The TIA deals expressly with the treatment of certain Tax Savings in Section 5(c).  In general, Section 5(c) provides that Tax Savings arising after a lump-sum indemnity payment by United are to be rebated to United in certain circumstances.  However, this is true *only* when United is *not* in default under any of the Operative Documents.  GFCC App., Tab 3 (Group Exhibit A), *TIA* § 5(c).  Accordingly, in calculating the amount of the TIA Claim, GFCC did not reduce United's indemnity obligations by the amount of any purported future Tax Savings.

### F.      GFCC is the Exclusive Holder of the TIA Claim.

United's obligations under the TIAs are owed to GFCC only.  United and GFCC are the only parties to the TIAs.  The Owner Trustee has no rights under the TIA and so could not and did not assign any such rights under the Indenture.  Moreover, to reinforce this point, GFCC's TIA Claim is an "Excluded Payment" under the Indenture and, consequently, by express exclusion, was

not pledged to repay the equipment notes that were issued under the Indentures.[9] Moreover, Net

Economic Return, which the TIA protects, is defined in the lease solely by reference to *GFCC*'s

net after-tax book yield and aggregate after-tax cash flow. Thus, the calculation of Net Economic

Return is made solely by reference to GFCC's aggregate after tax cash flows under the lease or the

TIA, as applicable.

**G.** **The TIA Claim is Not Duplicative of the Claims of the Indenture Trustee.**

Section 8 of the TIA expressly provides that SLV (Stipulated Loss Value—a liquidated

damage remedy in the case of a default or lease acceleration) must be reduced to take into account

United's obligation to make an indemnity payment under the TIAs, thereby allowing United to

protect itself from the risk of double liability. GFCC App., Tab 3 (Group Exhibit A), *TIA* § 8.

TIA Section 8 of the TIA states, in full:

> SECTION 8. Adjustment of Stipulated Loss Value and Termination Value. If
> any amount is required to be paid hereunder by the Lessee with respect to a Loss
> and is actually so paid, the Owner Participant shall cause the Lessor to recompute
> Stipulated Loss Value and Termination Value percentages with respect to the
> Aircraft to reflect such Loss in accordance with the manner in which such values
> were originally computed, or adjusted pursuant to Section 3 of the Lease, by the
> Owner Participant, and shall certify to the Lessee either that such percentages as
> set forth in the Lease do not require change or, as the case may be, the new values
> necessary to reflect the foregoing recomputation, describing in reasonable detail
> the basis for computing such new percentages, and upon such certification such
> new percentages shall be substituted for the percentages appearing in the Lease.
> In no event shall Stipulated Loss Value or Termination Value as recomputed for
> any period be less than the principal amount, premium, if any, and accrued
> interest on the Loan Certificates. Any recomputation under this Section 8 shall
> not take into account any Tax Law Changes.

Section 3(c)(i) of the lease provides that all such adjustments must be made consistent with

maintaining GFCC's Net Economic Return. GFCC App., Tab 3 (Group Exhibit A), *Lease*,

§3(c)(i). Although GFCC's TIA Claim is in no way conditioned upon a reduction in SLV pursuant

---

[9]     GFCC App., Tab 3 (Group Exhibit A), *Indenture*, Habendum Clause at pg. 5. "Excluded Payments" are
defined in the Leases to include ". . . (iv) all payments required to be made under the Tax Indemnity Agreement. . ."
GFCC App., Tab 3 (Group Exhibit A), *Lease*, Definition of "Excluded Payments" at pg. 6.

to Section 8 (any such SLV reduction is an issue solely between United and the Indenture Trustee),

Section 8 does provide a mechanism by which the amount payable to GFCC under its TIA Claim

will trigger a reduction in SLV and thereby prevent the Indenture Trustee from recovering

duplicative amounts.

**H.**     **No Part of GFCC's TIA Claim Has in Fact Been Paid to the Indenture Trustees.**

In September 2005, United and the Indenture Trustees sought approval of a comprehensive

settlement agreement involving the aircraft lease transactions at issue here, among others.  The

settlement contemplated that the lease would be rejected by United and that the Indenture Trustees

would foreclose against the aircraft, all of which has since occurred.  GFCC App., Tab 15, pg. 3.

GFCC objected to the proposed settlement with United in order to protect its TIA Claims.

GFCC and United resolved GFCC's objections by including the following language in paragraph

24 of the September 27, 2005 order approving the settlement:

> Nothing in the approval of the Motion shall operate to adjudicate or otherwise
> prejudice General Foods Credit Corporation's ("GFCC") claims for tax indemnity
> ("TIA Claims") . . . .  The deficiency claim allowed in favor of the Trustees under
> such Term Sheet does not include GFCC's TIA Claims and was not calculated by
> reference to Stipulated Loss Value and United and other parties in interest will not
> have an objection to GFCC's TIA Claims on such basis; it being understood,
> however, that all other objections to the TIA Claims are expressly reserved and
> preserved.

(the "Settlement Order").  GFCC App., Tab 1, ¶ 24.  By virtue of the Settlement Order, it has been

established that the Indenture Trustee's claims based on the collateral assignment of the lease

rentals was not calculated by reference to SLV and does not include a tax indemnity component.

Further, as expressly set forth in the Settlement Order, United cannot raise an objection to GFCC's

claim on the basis that a claim calculated based on SLV has already been paid to the Indenture

Trustee.  As such, no portion of the claim allowed in favor of the Indenture Trustee overlaps with

the TIA Claim.  In fact, no duplication of GFCC's TIA Claim and SLV exists because United has not paid an amount calculated by reference to SLV to anyone.

**I.**      **Objection to the TIA Claim and Bankruptcy Court's Ruling.**

United filed objections to GFCC's TIA Claim.  GFCC App., Tabs 2 and 7.  United argued that GFCC's TIA Claim should be reduced in accordance with a formula proposed by United, which gave United a credit for the amount of GFCC's purported future Tax Savings.

On June 23, 2006, the Bankruptcy Court issued a Memorandum of Decision in which it interpreted the TIA to require that United be given an offset for Tax Savings.  GFCC App., Tab 15. The Memorandum of Decision was implemented through an order entered by the Bankruptcy Court on July 6, 2006, which reduced the Amended GFCC Claim to $20,145,728.94.  GFCC App., Tab 16.  GFCC appealed the Bankruptcy Court's order by filing a timely Notice of Appeal on July 14, 2006.  GFCC App., Tab 17.

## ARGUMENT

Before turning to the errors made by the Bankruptcy Court in its interpretation of the TIA, we first provide context to the financial impact of the court's ruling.  Had United not defaulted on its lease obligations, GFCC's tax liability would not have been accelerated and there would have been sufficient cash flows in excess of debt service to pay GFCC's future taxes and to provide GFCC with the agreed upon Net Economic Return.  But United did default, which resulted in GFCC incurring accelerated tax obligations and losing further cash flow from the lease with which to pay those taxes.  By reducing GFCC's claim from almost $95 million to approximately $20 million, the Bankruptcy Court left GFCC with $75 million less than what is required to be paid to GFCC to maintain its Net Economic Return, on an after-tax basis, as required by the formula agreed to in the TIA.

A.      **The Bankruptcy Court Ignored the TIA's Mandate to Maintain Net Economic Return.**

The Bankruptcy Court made a number of errors in its interpretation of the TIA.  First, it ignored the clear language of Section 5(b):  GFCC "shall" be paid an amount sufficient "to cause [its] Net Economic Return to be maintained."  Instead, the Bankruptcy Court effectively rewrote the TIA turning it into something far different than what was agreed to by the parties.  In the Memorandum of Decision, the Bankruptcy Court held that the TIA calculation of loss calls for a deceptively simple formula:  (A) GFCC's tax losses, plus (B) any interest and penalties owed to the IRS, less (C) an offset for the value of any tax savings realized by GFCC.[10]  In adopting this interpretation of the TIA, the Bankruptcy Court rejected several of GFCC's arguments, including that the TIA expressly requires maintenance of GFCC's Net Economic Return.  The Bankruptcy Court dismissed the TIA's "reference" to Net Economic Return, stating that it only provides a "cap" on the indemnity.  GFCC App., Tab 15 at pg. 7.  A plain reading of the relevant language in the TIA makes clear that far from being a mere "reference" or "cap," the requirement to maintain Net Economic Return is fundamental to every element in the calculation, including consideration of whether an offset for Tax Savings is appropriate.

The Bankruptcy Court's elimination of the TIA requirement that GFCC's Net Economic Return be maintained is the starkest example of its errors.  Net Economic Return is at the very heart of the calculation specified in the TIA.  To suggest it is a mere "reference" or a "cap on the [TIA] claim" (GFCC App., Tab 15 at pg. 7) violates the plain reading of the TIA.  *See Caisse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1272 (7th Cir. 1996) (contracts must be governed by their plain meaning) (construing New York law); *Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (Ct. App. N.Y. 1971); *Levine v. Shell Oil Co.*, 28

---

[10]      GFCC App., Tab 15 at pgs. 5-9.  This amount needs to be paid on an After-Tax Basis which is the subject of the so-called Gross-up Issue in the Bankruptcy Court's decision.

N.Y.2d 205, 212-213, 321 N.Y.S.2d 81, 269 N.E.2d 799 (Ct. App. N.Y. 1971).  The obligation to "*cause* Net Economic Return to be *maintained*" is an unequivocal mandate.  The language establishes an exact standard for determining whether United has satisfied its indemnity obligation: has United paid an amount sufficient to maintain GFCC's Net Economic Return.  If Net Economic Return operates as a cap at all, it would "cap" the amount of *offset* which United can claim for Tax Savings, not the amount of the TIA Claim itself.  All TIA calculations, from the initial claim amount to any potential offsets, must satisfy and be read in light of this mandate.

In contrast, the Bankruptcy Court applied the formula offered by United.  But that formula is not in the TIA at all.  In order to accomplish what the TIA requires, each element of United's formula, including the subtraction of item (C) (i.e., the so-called Tax Savings), must be measured against the assumptions used in the original calculation of Net Economic Return.  The subtraction of Tax Savings is an element actually expressed in the TIA as something to be *taken into account*.  Whether and to what extent Tax Savings are to be taken into account as an offset depends on the requisites of Net Economic Return under the given facts.  That is, any potential tax savings can be taken into account only as part of a calculation that maintains Net Economic Return overall.  To do this, one must ask how the taxes, whether paid or saved, would be factored into the Net Economic Return calculation.  One cannot simply subtract so-called Tax Savings without asking whether or to what extent that result is consistent with maintenance of Net Economic Return.[11]

If a subtraction was intended in all cases, regardless of maintaining Net Economic Return, the TIA could have easily provided so.  It could have laid out the simple formula that the Bankruptcy Court erroneously adopted.  However, the parties to the TIA did not do that.  They instead made Net Economic Return the standard that all components of the calculation must

---

[11]     There are many circumstances where allowing a simple subtraction for tax savings may be appropriate. These include situations where the tax savings result from an unanticipated tax deduction or credit that had never been factored into the Net Economic Return cash flows.

achieve, regardless of the unique circumstances brought into play in any given case. In fact, given

United's default in the payment of rent (which would otherwise be used by GFCC to pay those

taxes), any such subtraction or offset for saving such taxes erodes, rather than preserves, Net

Economic Return. The Bankruptcy Court, by referring to Net Economic Return as only providing

a "cap" to the indemnity, implicitly recognized that its formula would not maintain Net Economic

Return and that its allowed claim would fall short of doing so. This clearly violates the TIA.

**B.**      **The TIA Maintains Cash Flows After-Tax.**

In its interpretation of the TIA, the Bankruptcy Court failed to recognize that, based on the

definition of Net Economic Return in the lease, the maintenance of Net Economic Return requires

that GFCC's expected "aggregate after-tax cash flow" be preserved. GFCC App., Tab 3 (Group

Exhibit A), *Lease* §1, pg. 11. It is crucial that the cash flows be maintained "after-tax." This lies

at the heart of the concept of Net Economic Return and this element distinguishes it from other

types of financial yardsticks. If GFCC has to pay income tax (a cash outflow) because of its

investment, but there exists a corresponding amount of cash inflow to reimburse it for such income

tax outflow at some point in the life of the transaction, then Net Economic Return assumes that

these taxes are paid from the cash flow generated from the investment and *not* from GFCC's

independent funds. These offsetting flows are essential to Net Economic Return here. Unlike a

measurement of financial success which is pre-tax (such as interest on a loan), an after-tax

measurement of success such as Net Economic Return cannot be maintained unless the anticipated

taxes are paid from the internal cash flows of the investment *to the same extent* and on the same

basis as originally contemplated and agreed. Since the operative documents (in this case, under

the TIA) provide that cash flows must be maintained *after tax* and in the aggregate (that is, over

the life of the transaction), then the transaction must generate cash flows sufficient both to pay

anticipated taxes and to reimburse unanticipated taxes to the same extent as originally assumed.

GFCC App., Tab 3 (Group Exhibit A), *TIA* §5, *Lease* §1, pg. 11.  Net Economic Return under the TIA cannot otherwise be maintained.

**C.**     **United's Offset Claim Violates the Maintenance of Net Economic Return.**

The Memorandum of Decision refers to United's arguments about Tax Savings as "The Offset Issue."  GFCC App., Tab 15 at pg. 5.  One must follow a few twists and turns to see the exact nature of the offset that United claims.  Had United's defaults never occurred and had the lease continued as originally contemplated, United would have continued to pay rents and GFCC would have reported taxable income from such rents.  United claims that because of its own default, GFCC incurs income taxes now but will not incur such taxes in the future.  Accordingly, it makes a claim for an offset attributable to the avoidance of future taxes that were originally scheduled.  This is the so-called "Tax Savings" to which United and the Bankruptcy Court's Memorandum of Decision refers.

At the time of the actual default, GFCC's aggregate anticipated future taxes were less than the total aggregate cash flows (after debt service) available to GFCC from anticipated rents.  GFCC App., Tab 6 at Exhibit A.  The lease was expected to generate the cash flows necessary to pay all such taxes.  Had United not defaulted under and rejected the lease, GFCC's Net Economic Return would have been maintained by taking into account both the payment of these anticipated taxes imposed upon rental income (outflow) and the receipt of cash flows from United to pay for them (inflow).  United's default changed both assumptions underlying the original calculation of Net Economic Return.

By giving United its requested offset, the Bankruptcy Court ignored the fact that all of GFCC's future scheduled taxes were to be paid from lease cash flows.  Under the calculation of Net Economic Return, those taxes were not to be paid by a new investment from GFCC.  Plainly, the relief from a payment one did not expect to have to make (in the form of an investment of new

16

funds) cannot be called a "savings."  Yet this is exactly the effect of the Memorandum Decision.

There is no benefit here to GFCC, only a further detriment; the lease has been rejected, but there

are still taxes to be paid.  The calculation of Net Economic Return has always required United to

provide GFCC with sufficient rent to pay these taxes "on the basis of the same methodology and

assumptions as were utilized" at inception in pricing the transaction.  See definition of Net

Economic Return at GFCC App., Tab 3 (Group Exhibit A), *Lease* §1, pg. 11.  The Bankruptcy

Court erroneously gives United the "offset", and by doing so not only ignores the requirement of

Net Economic Return, but also reward's United for the consequences of its own breach.  GFCC

App., Tab 15 at pgs. 6 and 9.

**D.**      **Consideration of Tax Savings Is Expressly Conditioned on No Defaults by United.**

The Bankruptcy Court also ignored a provision in the TIA that shows the clear intent of the

parties that United is not entitled to a credit for Tax Savings when it is in default.  In interpreting

how "Tax Savings" are to be "taken into account" within the meaning of Section 5(b) of the TIA,

it is highly instructive to understand how the TIA accounts for Tax Savings in other circumstances.

Consistent with the mandate to preserve Net Economic Return, but not to provide GFCC a

windfall in excess of Net Economic Return, Section 5(c) of the TIA provides that if Tax Savings

are realized in a future year, but had not been previously "taken into account" in the calculation of

the lump sum indemnity, then they must be paid to United as and when realized.  GFCC App., Tab

3 (Group Exhibit A), *TIA* §5(c).  This provision supplements the general Net Economic Return

requirements in the circumstance where future Tax Savings as actually realized differ from what

was contemplated at the time of the original lump sum indemnity.  However, Section 5(c) states

expressly that if United is in default of the operative documents (including the lease), then the

default suspends United's right to receive a payment from GFCC based on Tax Savings.

The Bankruptcy Court stated that "[t]here is nothing in the relevant language that would allow the lump sum [indemnity] payment to include additional taxes and penalties payable by reason of a loss but exclude taxes avoided by reason of the loss." GFCC App., Tab 15 at pg. 6. That statement is wrong. Section 5(c) plainly provides that the TIA does in fact exclude Tax Savings when United is in default, as is the case here.

Section 5(c)'s exclusion of future Tax Savings in the face of a default by United is a specific example of the same general requirement contained within the mandate of maintaining Net Economic Return. In fact, both provisions have the same goal. Section 5(c) is not an exception to Section 5(b), and both provisions must be read in a consistent manner. Giving United credit or an offset for Tax Savings when United is in default would ensure that GFCC does not receive its Net Economic Return, in contravention of the overarching principle of Section 5(b). In Section 5(c), a default prevents an otherwise expressly required payment on account of Tax Savings. The same principle applies in the calculation of the lump sum indemnity from United where the more general terms "Net Economic Return" and "taken into account" are used, but no precise reference to a default is necessary. No reference to a default is necessary because a Net Economic Return calculation, by definition, requires the maintenance of after-tax cash flow taking into account the events giving rise to the tax loss. Any assertion that United's default should be ignored in calculating the amounts owing under the TIA would require reading Section 5(c) out of the agreement altogether. It also requires reading out of the TIA the mandate that Net Economic Return be maintained. And that is precisely what the Bankruptcy Court did. In fact, it never even discussed Section 5(c).

All parts of Section 5 of the TIA must be read consistently to produce a coherent result. "Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that

agreement." *American Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990).  Under New York law, to determine the plain meaning of the contract necessarily means that it must be construed in a manner that gives effect to all of its provisions. *Gregory v. Simon & Schuster, Inc.*, 1994 WL 381481 (S.D.N.Y. 1994).[12]  That, in turn, requires that the court consider contracts as a unified whole, ensuring that the terms of the contract are interpreted in their proper context and avoiding putting undue emphasis on particular provisions or rendering other provisions meaningless. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("a document should be read to give effect to all its provisions and to render them consistent with each other.") (applying New York law); *Deutsche Bank AG v AMBAC Credit Prods., LLC*, 2006 WL 1867497, *10 (S.D.N.Y. 2006) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible."); *Analisa Salon, Ltd. v. Elide Properties, LLC*, 818 N.Y.S.2d 130 (N.Y. App. Div. 2006) (holding that in interpreting one provision of a contract, it should be read as a whole so that the provisions are interpreted in the proper context).

Reading Sections 5(b) and 5(c) together, it is impossible to reconcile

- the requirements to maintain Net Economic Return (under 5(b)) and to prohibit repayments of future Tax Savings during a default (under 5(c)); with
- United's offset claim, which is based on ignoring the existence of its default at the time the original lump-sum indemnity payment is due.

When, as here, owner participant has negotiated an exception from paying unexpected Tax Savings that arise in the future if a default exists (as Section 5(c) plainly states), it is illogical to conclude that the Net Economic Return requirement in Section 5(b) ignores contemporaneous defaults with regard to the applicability of a Tax Savings offset, as now claimed by United.

---

[12]     Unpublished decisions are attached hereto as an Appendix.

E.     **Assignment of SLV to the Indenture Trustee Cannot Change the TIA Obligations.**

The Bankruptcy Court also said that it found support for its formulaic approach in other provisions of the operative documents, including those which assign the SLV amounts under the lease to the Indenture Trustee. However, the treatment of SLV under the lease neither argues for nor permits United's offset claim. The Bankruptcy Court utilized the following incorrect syllogism:

- *Lease* payments of SLV can provide for cash flows for both the rents and for tax benefits for the owner participant.

- All *lease* claims for rents have been assigned to the lenders.

- Therefore, the *TIA* cannot take into account cash flows from rents but only the tax benefits.

The syllogism is invalid.[13] Although Net Economic Return can be protected as a part of SLV under the lease (an agreement with the Owner Trustee), this does not mean Net Economic Return cannot also be protected under the TIA (an independent agreement with GFCC). The Bankruptcy Court, through the fallacy of its mistaken syllogism, held that GFCC's TIA Claim was inconsistent with the assignment of lease rents to the Indenture Trustee. However, the question is not whether rents or SLV were assigned to the Indenture Trustee –they clearly were – the question is whether the claims for rent under the lease and their assignment to the Indenture Trustee negate in any way United's independent, unpledged obligation in the TIA to maintain GFCC's own Net Economic Return. The answer to that question is just as clear. The lease claim for SLV does not limit the TIA Claim. In fact, just the opposite is true. That is, payments under the TIA reduce the

---

[13]     The Bankruptcy Court's syllogism is reminiscent of the following common syllogistic fallacy:
- Some dogs are brown
- All dogs have four legs
- Therefore, all animals which are brown are also four-legged.

The conclusions in both cases are *non sequiturs*. The fact that some dogs share common features does not mean that those features are always shared by other animals; the fact that the lease includes rents and those rents (excepting Excluded Payments) have been assigned does not mean that the TIA, a separate agreement, must ignore the default of lease rents in considering the maintenance of Net Economic Return.

Indenture Trustee's claim for full SLV, not the other way around.  The Bankruptcy Court got it backwards.

The Bankruptcy Court correctly referenced Section 8 of the TIA which operates to reduce SLV upon payment of amounts under the TIA, but inexplicably reversed the effect of that provision.  GFCC App., Tab 15 at pg. 9.  Section 8 clearly was intended to allow United to protect itself from possible double count of cash flows payable under the TIA and those under the lease for SLV.  The Bankruptcy Court erred, however, by (1) inventing a condition that Section 8 applies only if the lease is not in default (a condition not itself contained in Section 8), and (2) apparently making GFCC's TIA Claim conditional upon the prior application of Section 8.  GFCC App., Tab 15 at pg. 9.  Nothing in Section 5 of the TIA (which sets forth the indemnity obligation) references the SLV adjustments under Section 8 as a precondition; rather it works the other way. The Section 8 adjustments are made only after the Section 5 payments are made.

The Bankruptcy Court stated that GFCC "is entitled to no part of the cash flow under the lease."  GFCC App., Tab 15 at pg. 9.  This is beside the point, as GFCC is not making any claim for such lease payments.  The assertion also suggests that the Bankruptcy Court may have been concerned that GFCC's TIA claim was duplicative of the Indenture Trustee's claim.  But that concern was mistaken.  As the stipulated facts in the Settlement Order establish, no part of GFCC's TIA Claim has been paid to the Indenture Trustee and United cannot defend against the TIA Claim on the basis of the TIA Claim being included in the amounts paid under that Settlement Order.  Indeed, the Settlement Order states that the Indenture Trustee has not received any amounts calculated by reference to SLV in resolution of its claims.  GFCC App., Tab 1 ¶ 24. Thus, as the Stipulated Order establishes, there is no duplication in this case.

Even if somehow there were duplication, there is still no basis to challenge GFCC's TIA

Claim. United's remedy would be to reduce the SLV claim asserted by the Indenture Trustee.

That is the entire purpose for Section 8 of the TIA. GFCC is making a claim separate from the

lease. It is not taking cash flows that have been assigned. Its claim arises solely under the TIA for

its anticipated aggregate after-tax cash flows to the same extent as originally contemplated and

agreed. That, and not United's simplistic and inapposite formula, is precisely what the TIA

requires.

## F.     __Summary.__

GFCC suffered an unanticipated tax liability caused solely by the actions of United. GFCC

App., Tab 3 (Group Exhibit A), *TIA* §§1(i) (definition of "Operative Event") and 5(a) (definition

of "Loss"). Given the assumptions made in the TIA for calculation purposes, this tax liability is

easy to determine – it is the tax rate dictated by the TIA multiplied by the gain on sale. GFCC

App., Tab 3 (Group Exhibit A), *TIA* §§2 (Tax Assumptions) and 5(b) (Indemnity). United's

actions qualify as a triggering event for payment of an indemnity under the TIA, an amount that

must be determined on an after-tax basis to account for GFCC's obligation to include the receipt of

the indemnity payment in its taxable income. GFCC App., Tab 3 (Group Exhibit A), *TIA* §5(a)

(definition of "Loss"). The TIA provides a claim owed directly to GFCC independent of all other

rights or obligations under the other operative documents. GFCC App., Tab 3 (Group Exhibit A),

*Lease* §1 (definition of "Excluded Payments"). The measure of the indemnity claim is an amount

necessary to maintain GFCC's Net Economic Return, which in turn requires preservation of its

aggregate cash flows on an after-tax basis. GFCC App., Tab 3 (Group Exhibit A), *TIA* §5(b)

(Indemnity); *Lease* §1 (definition of "Net Economic Return"). The after-tax cash flows expected

from this investment anticipated that all taxes would be paid from cash flows internally generated

by the investment rather than from any other GFCC source of funds. GFCC App., Tab 6, Exhibit

A.  Therefore, these unanticipated tax liabilities must be accompanied by a corresponding lump sum payment to GFCC in an amount sufficient for GFCC's Net Economic Return to be preserved in respect of such liabilities.

The Bankruptcy Court failed to allow the GFCC Claim in that amount.  The TIA, by providing for preservation of GFCC's Net Economic Return, requires that amount to be paid by United.  Any proposed offset against the TIA Claim for illusory "savings" will erode, not maintain, Net Economic Return under the actual facts presented here.  The required payment totals $94,999,522.76, which after reduction for income taxes payable on such amount, will yield the unanticipated tax liabilities now payable and, consequently, is the allowed unsecured claim to which GFCC is entitled.  GFCC App., Tab 3 at Exhibit E.

## CONCLUSION

For the foregoing reasons, Appellant requests that the Court overrule the Bankruptcy Court's Order and remand this matter to the Bankruptcy Court for entry of an appropriate order.

August 24, 2006

Respectfully Submitted:


By:/s/ John J. Voorhees, Jr.

David S. Curry (ARDC #6184327)
Robert A. Kelman (ARDC #1440470)
Jonathan D. Kron (ARDC #6190570)
John J. Voorhees, Jr. (ARDC #6209292)
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone:(312) 782-0600
Facsimile: (312) 701-7711

and

David Abbott (ARDC #3126754)
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019-5820

Telephone:(212) 506-2500
Facsimile:  (212) 262-1910

*Attorneys for Appellant*

**Appendix**

**Unpublished Decisions**

Westlaw.

Slip Copy                                                                                                  Page 1
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

H

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

DEUTSCHE BANK AG, Plaintiff,

v.

AMBAC CREDIT PRODUCTS, LLC and AMBAC Assurance Corporation, Defendants.

**No. 04 CIV. 5594(DLC).**

July 6, 2006.

Theodore D. Aden, Epstein Becker & Green, New York, NY, for plaintiff.

David W. Dykhouse, Philip R. Forlenza, Patterson, Belknap, Webb & Tyler LLP, New York, NY, for defendants.

DENISE COTE, District Judge.

**\*1** This is a dispute over a complex transaction between two sophisticated financial institutions. Although the instruments involved are somewhat abstruse, the central issue can be boiled down to a relatively straightforward question of contract interpretation: When was plaintiff Deutsche Bank AG ("DB") required to deliver a group of bonds to defendant Ambac Credit Products, LLC ("ACP")? DB claims that although the documents governing the disputed transaction set out a detailed timeline for delivery of the bonds, industry practice and other contractual provisions allowed for delivery well past the nominal deadline. Therefore, according to DB, ACP breached the contract when it refused to pay for the bonds DB tendered one month after the putative delivery date.

A bench trial was held on June 26, 27, and 29. This Opinion presents the Court's findings of fact and conclusions of law and concludes that ACP did not breach its contract with DB, since it was under no obligation to pay for bonds that were not delivered in accordance with the contractual terms. As a result, DB's common law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and equitable estoppel fail.

*Procedural History*

DB filed this action on July 19, 2004, alleging breach of

contract against defendants ACP and Ambac Assurance Corporation ("AAC").FN1 After the completion of fact discovery, defendants filed a motion for summary judgment or to bar DB from introducing evidence of industry custom. The motion was denied in a Memorandum Opinion of August 22, 2005. *Deutsche Bank AG v. AMBC Credit Products, LLC,* No. 04 Civ. 5594(DLC), 2005 WL 2033379 (S.D.N.Y. Aug. 22, 2005). On November 15, 2005, DB filed its first amended complaint, adding two claims against ACP: (1) breach of the implied covenant of good faith and fair dealing, and (2) equitable estoppel. On February 15, 2006, DB filed a second amended complaint, augmenting its breach of contract claims.

> FN1. AAC is a subsidiary of Ambac Financial Group, Inc. ("Financial"), an American monoline insurance company. Financial is not a defendant in this action. It is the parent company, however, of defendant AAC. AAC, in turn, is the parent company of defendant ACP. AAC issues financial guarantees and loss indemnity policies, and AAC engages in credit derivative transactions. ACP does not have officers and employees distinct from the officers and employees of AAC.

*Trial Procedure*

The trial was conducted without objection in accordance with the Court's customary practices for the conduct of nonjury proceedings. The parties submitted a Joint Pretrial Order and proposed findings of fact and conclusions of law on June 12, 2006. The parties also served affidavits containing the direct testimony of their witnesses, as well as copies of all the exhibits and deposition testimony that they intended to offer as evidence in chief at trial.

With its Pretrial Order submissions, plaintiff presented declarations constituting the direct testimony of Kenneth Brougher ("Brougher"), vice president of Deutsche Bank Securities, Inc., a subsidiary of DB; Steven Horn ("Horn"), director of Deutsche Bank Securities, Inc.; Boaz Weinstein ("Weinstein"), head of credit trading for the Americas in DB's New York branch; Roman Shukhman, a trader on the credit derivatives desk at JP Morgan Chase ("JPMC"); Mei-Mei Sandy Wong, a member of JPMC's settlement group;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

and Lisa Sloan ("Sloan"), former chief administrative officer and director of operations for M. Safra & Co., a hedge fund manager. With the exception of Shukman, who defendants chose not to cross-examine, each of these witnesses appeared at trial and was cross-examined.

**\*2** Defendants offered the testimony of Peter Campbell ("Campbell"), the manager of Financial's treasury operations group; Thomas Gandolfo, chief financial officer of Financial and its subsidiaries during the relevant period; David Gleeson ("Gleeson"), an accountant for Financial's credit derivatives business line during the relevant period; Cynthia Parker ("Parker"), managing director for credit derivatives for Financial and its subsidiaries; Douglas Renfield-Miller, senior managing director of AAC during the relevant period; David Weissman, a senior executive at AAC and ACP; Joseph Swain ("Swain"), a senior officer of Assured Guaranty Corporation ("Assured"); and M. Holland West ("West"), a former partner at Shearman & Sterling LLP and former head of its global derivative, hedge fund, structured finance, and private equity practices. Each of these witnesses appeared at trial and was cross-examined.

Excerpts from the depositions of testifying witnesses, as well as the following individuals, were offered and received into evidence at trial. Plaintiffs offered excerpts from the depositions of Kirk Ballard ("Ballard"), a senior analyst covering North American settlements for DB; David Barranco, an employee of Financial; and Maria Ruf, a back office clerk for DB in the international bond market during the relevant period. Defendants offered excerpts from the depositions of Ballard; Ruff; and Ernest Goodrich, Jr., managing director and senior counsel in DB's credit derivatives business.

### FINDINGS OF FACT

The disputed transaction here is a species of credit derivative called a credit default swap ("CDS"). Credit derivatives are akin to insurance policies for holders of corporate bonds or other securities against downgrades in the credit of the issuing companies. They do this by transferring credit risk from a "protection buyer" to a "protection seller." [FN2] A CDS is a common type of credit derivative in which the protection buyer makes a fixed payment to the protection seller in return for a payment that is contingent upon a "credit

event"-such as a bankruptcy-occurring to the company that issued the security (the "reference entity") or the security itself (the "reference obligation"). The contingent payment is often made against delivery of a "deliverable obligation"-usually the reference obligation or other security issued by the reference entity-by the protection buyer to the protection seller. This delivery is known as the "physical settlement." [FN3] Some CDS transactions, such as the one at issue here, are known as "portfolio" transactions, meaning they cover multiple reference entities and reference obligations.

> [FN2.] A credit derivative is a synthetic instrument, however, and not all purchasers of such "protection" actually own the security covered by the transaction.

> [FN3.] The parties can sometimes settle transactions without a transfer of securities. This is known as a "cash settlement" and is not at issue here.

CDS transactions are of relatively recent origin, having been developed in the mid-1990s. They are highly negotiated and are customarily based on standard terms published by the International Swaps and Derivatives Association, Inc. ("ISDA"). These terms may be modified for a particular transaction. At the time the transaction at issue here was executed, the 1999 ISDA Credit Derivatives Definitions ("1999 Definitions") provided the foundation for most CDS agreements.

**\*3** The 1999 Definitions, which contemplate a transaction involving a single reference obligation, set out a highly detailed, carefully choreographed set of procedures to be followed if the reference entity experiences a credit event. First, pursuant to Section 3.3, either party may notify the other party of the credit event by means of an irrevocable Credit Event Notice, containing "a description in reasonable detail of the facts relevant to the determination that a Credit Event has occurred." Once the Credit Event Notice has been provided, the buyer of protection has 30 days to provide the seller with a Notice of Intended Physical Settlement ("NIPS"). [FN4] Under Section 3.4, NIPS

> [FN4.] In some cases, an associated document,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 3
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

known as a "Notice of Publicly Available Information" must also be delivered before the 30-day period begins to run.

means an irrevocable notice from Buyer ... to Seller that confirms that Buyer will settle the Credit Derivative Transaction and require performance in accordance with the Physical Settlement Method, and containing a detailed description of the type of Deliverable Obligations that Buyer reasonably expects to Deliver to Seller.

If a NIPS is not delivered within the 30-day window, the transaction terminates, and the buyer loses its ability to make any claim for credit protection. In the words of Section 3.4, the "thirtieth calendar day shall be the *Termination Date*." (Emphasis supplied.)

Assuming that a timely delivery of a NIPS has been made, the parties must settle the transaction within the Settlement Period, which is defined in Section 8.5 as:

the number of Business Days specified as such in the related Confirmation or, if a number of Business Days is not so specified, the longest of the number of Business Days for settlement in accordance with *then current market practice* of any Deliverable Obligation being Delivered in the Portfolio, as determined by the Calculation Agent, in consultation with the parties.

(Emphasis supplied.) The reference to "current market practice" allows the Calculation Agent to identify the delivery date that is customary for the securities that are at issue.

The final day of the Physical Settlement Period is known as the Physical Settlement Date, and under Section 8.1, it is the date on which the parties' obligations to each other come due:

*Buyer shall ... on or prior to the Physical Settlement Date Deliver to Seller* all or part of that portion of the Portfolio specified in the Notice of Intended Physical Settlement *and Seller shall pay to Buyer* that portion of the Physical Settlement Amount that corresponds to the portion of the Portfolio that Buyer has Delivered.

(Emphasis supplied.) Thus, the seller's duty to pay is dependent on the buyer of protection's delivery of the securities identified in the NIPS.

Pursuant to Section 8.3, if delivery is completed by the Physical Settlement Date, the transaction ends. It provides that "If the entire portion of the Portfolio specified in the Notice of Intended Physical Settlement is Delivered on or before the Physical Settlement Date, the Physical Settlement Date shall be the *Termination Date*." (Emphasis supplied.)

**\*4** Section 9.3(c)(ii), however, loosens the requirement that the buyer make delivery "on or prior to" the Physical Settlement Date:

Buyer may continue to attempt to Deliver the whole of the Portfolio specified in the Notice of Intended Physical Settlement *for an additional five Business Days after the Physical Settlement Date.* Subject to Section 8.1 and to Sections 9.4, 9.5, 9.6 and 9.7, *if Buyer fails to Deliver any portion of the Portfolio specified in the Notice of Intended Physical Settlement on or prior to the date that is five Business Days after the Physical Settlement Date,* such failure shall not constitute an Event of Default and *such date shall be deemed to be the Termination Date.*

(Emphasis supplied.) This provision creates a five-day grace period for the delivery of deliverable obligations to account for back-office delays in the procurement and delivery of securities. If, however, the buyer fails to make delivery within that five-day window, the transaction terminates, and the buyer loses its ability to make any claim for credit protection.

Thus, once a credit event occurs, the parties have a strictly controlled time-frame in which to act. A buyer of protection must first deliver a NIPS and then the securities within the time frames allowed, or lose the right to obtain payment from the protection seller. Similarly, assuming the buyer has performed its obligations, the seller of protection must be prepared to make the required payment associated with the credit event within a defined and relatively short period of time following a credit event.

*The Triplets Transaction*

In the transaction that is the subject of this lawsuit, DB, a large international bank headquartered in Germany, functioned as the protection buyer, and ACP functioned as the protection seller. The parties entered into a Master Agree-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment dated December 17, 1998, as well as a Schedule and Credit Support Annex (collectively, the "Master Agreement"). AAC also issued a Financial Guarantee Insurance Policy (the "Guarantee") unconditionally and irrevocably guaranteeing "any payment of the Cash Settlement Amount due from [ACP] to [DB] pursuant to the terms of any confirmation under the Master Agreement." The Schedule provides that the Master Agreement will "be governed by, and construed and enforced in accordance with, the laws of the State of New York without reference to its choice of law doctrine."

ACP and DB then entered into a Confirmation dated April 19, 2000 issued under the Master Agreement ("Confirmation") and relating to a CDS transaction known as "Triplets." Triplets involved a portfolio of 60 reference entities and reference obligations, including 7.375% Bonds due in 2027, issued by Solutia Inc. (the "Solutia Bonds").FN5 DB agreed to pay ACP at regular intervals for the credit protection provided under the Confirmation. The Confirmation expressly incorporates the Master Agreement, the Schedule, and the 1999 Definitions, including the right of either the protection buyer or seller to serve a Credit Event Notice. It states that "[i]n the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern."

> FN5. Portfolio transactions were a relatively new addition to the credit derivative market in 2000. In fact, Triplets was one of the first portfolio credit derivative transactions to which DB had been a party.

**\*5** It was, in fact, necessary for the Confirmation to override certain provisions of the 1999 Definitions, since Triplets involved multiple reference entities and obligations, while the 1999 Definitions contemplated a single-name transaction. For example, under the 1999 Definitions, both completion of physical settlement and failure to adhere to the physical settlement timeline end the entire transaction. Here, however, the parties did not want the entire Triplets transaction to terminate upon the occurrence of a single credit event relating to a single reference entity, but to provide credit protection for a five-year term. Therefore, the Confirmation, which provides for an "Effective Date" of May 2,

2000, defines the "Termination Date" as "[t]he later to occur of the Scheduled Termination Date and the final Physical Settlement date." The "Scheduled Termination Date" is listed as May 2, 2005.

*The Solutia Credit Event and Physical Settlement*

Solutia filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York on December 17, 2003. Under the Confirmation, this filing constituted a credit event.FN6 As a result, DB delivered to ACP a Credit Event Notice and Notice of Publicly Available Information dated December 17, 2003, informing ACP of the Solutia bankruptcy. On January 16, 2004-the final date on which a NIPS could be delivered-DB sent ACP a NIPS, which stated in part:

> FN6. The Solutia bankruptcy was not the first credit event in the Triplets transaction. Indeed, eight of the other 59 reference entities in the portfolio had already experienced credit events. In each of these settlements, DB had always delivered a timely NIPS and tendered its obligation by the delivery dates specified in the NIPS.

[DB] reasonably expects to deliver to [ACP] the following Deliverable Obligation: [Solutia Bonds]. Pursuant to the terms of the Credit Derivative Transaction, *[DB] will deliver such Deliverable Obligations for Physical Settlement*, with the total outstanding principal balance required under the terms of the Credit Derivatives Transaction as determined by the Final Price of the [Solutia Bonds], *on February 4, 2004* (the "Delivery Date"). On the Delivery Date, [ACP] will delivery to [DB] the amount required under the terms of the Credit Derivatives Transaction.
(Emphasis supplied.) With this notice, DB chose FN7 the Delivery Date and triggered the duty of ACP to pay DB upon receipt of the Solutia Bonds. On February 2, DB sent ACP a letter confirming the terms of the Physical Settlement. The letter, which was revised on February 3, provides in relevant part:

> FN7. The Confirmation designates DB as the Calculation Agent. And it is the Calculation Agent who, in consultation with the parties, determines

Slip Copy                                                                                                              Page 5
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

the length of the Physical Settlement Period based on market practice for the security to be delivered. Bonds such as the Solutia Bonds are subject to a three-day settlement period. Ordinarily, therefore, the Delivery Date would have been three business days after January 16, or January 21. Because DB had to perform a final set of calculations regarding the value of the Deliverable Obligation on January 30, however, the Delivery Date was set three business days later, on February 4.

For purposes of clarifying the NIPS previously delivered to you, we hereby notify you that on the Delivery Date (as such term is defined in the NIPS) *[DB] reasonably expects to deliver to [ACP] a total of USD 8,771,000 in outstanding principal amount of the Deliverable Obligation* set forth in the NIPS.... Pursuant to the terms of the Credit Derivative Transaction, [DB] will deliver such Deliverable Obligations for Physical Settlement on the Delivery Date. *On February 4, 2004 (the Delivery Date), [ACP] is obligated to deliver to [DB] USD 8,771,000.*
(Emphasis supplied.)

Around February 4, ACP gave instructions to its custodian bank, the Bank of New York, to receive DB's delivery of Solutia Bonds. It also made a cash deposit of the Settlement Amount and instructed the Bank of New York to use the funds to pay for the Deliverable Obligation.

**\*6** Early on February 4, ACP sent an e-mail to DB instructing it to contact Gleeson to "confirm all details." Ballard, an employee in the London Debt Securities Operations Group at DB, subsequently left a message for Gleeson, then an accountant for the credit derivatives business line of Financial and its subsidiaries. Later that day, Campbell, the manager of Financial's treasury operations, and Gleeson returned the call. DB recorded the conversation FN8; pursuant to regulatory requirements, all calls on "financial lines" are recorded.

> FN8. There is some dispute about the date of the recorded conversation. Gleeson testified that he was certain it took place on February 4, since its purpose was to confirm the details of the transfer, which the parties would need to have communic-

ated by the Physical Settlement Date. Gleeson referred to the conversation in a February 4 e-mail. DB argues that the call took place after it failed to deliver the Solutia Bonds on the Delivery Date. Campbell testified that this sort of conversation does sometimes occur shortly after a "bond fail," and Ballard notes a communication with Campbell (although not with Gleeson) on February 9. Given that during the call neither party mentioned that DB had failed to deliver the bonds on the Delivery Date, and that Gleeson's February 4 e-mail refers to the conversation, it seems likely that the call took place on February 4. In any event, the parties agree that it took place no later than February 9.

Consistent with Ballard's statement that DB wanted to "make sure we got the details [of the settlement] clear," the parties confirmed the value and identity of the bonds, and the Bank of New York account number. During the conversation, which lasted just over a minute, Ballard mentioned that DB was "kind of short on ... on the position [i.e., Solutia Bonds] at the moment-we're waiting for the bonds to come in on the other side." After confirming account numbers and a phone number, Ballard added, "Thanks, Pete. You should get those [the Solutia Bonds] in the next day or two." Campbell responded, "Okay, no problem."

Under Section 9.3(c)(ii) of the 1999 Definitions, DB was required to deliver the Solutia Bonds no later than February 11-five business days after the Delivery Date of February 4. Therefore, even if the call took place on February 9, Ballard's suggestion that the bonds would be delivered within a "day or two" was consistent with DB's obligations under the Confirmation.

At the time, both Ballard and Campbell had operational roles at their respective firms. Ballard was not authorized to enter into or substantively amend CDS transactions on behalf of DB. Likewise, Campbell, who oversaw the settlement of securities transactions, did not have the authority to enter into, substantively amend, or waive ACP's rights under contracts. There is no evidence indicating that either Ballard or Campbell believed that their brief, casual conversation altered DB or ACP's rights or obligations pursuant to the Confirmation. Ballard did not inform anyone else at DB

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                          Page 6
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

about its substance. And after the conversation, there was no communication between DB and ACP regarding the Solutia Bonds for approximately four weeks.

DB did not make delivery on February 4 or even by February 11. DB had earmarked Solutia Bonds it was to receive around February 4 from JP Morgan Chase ("JPMC") and Credit Suisse First Boston ("CSFB") as the bonds it would deliver to ACP. The trades with JPMC were also CDS transactions; in that instance, DB was the protection seller. As of February 4, DB had not yet received the bonds due under these contracts, and it therefore possessed only about one-third of the Deliverable Obligation it was to provide to ACP. There is no evidence that DB made any effort to ensure that it received the Solutia Bonds from JPMC and CSFB in a timely manner. As a result, the bonds slowly rolled in over the month following the delivery date. Moreover, DB made no effort to substitute bonds owned and held by other parts of DB or to enter the market and try to obtain Soutia Bonds from other sources in order to make timely delivery to ACP. If it had entered into the market to try to obtain the bonds from other sources, it is not clear that it would have succeeded in doing so since it was difficult for CSFB to obtain Solutia Bonds during this period.

**\*7** As it turned out, it took until March 4 before DB had the total amount of the Deliverable Obligation from JPMC and CSFB, and it tendered the Solutia Bonds to ACP on that same day. The Bank of New York refused the tender because on February 26 ACP had removed its instruction to accept the delivery. On February 26, an ACP executive with an expertise in CDS transactions and knowledge of the Triplets transaction learned for the first time that DB had failed to make a timely delivery of Solutia Bonds. She immediately understood that ACP might be "off risk" as a result of DB's default and took steps that led to the removal of the instructions to Bank of New York to pay DB. As described below, after confirming market practice, ACP made a final decision in April not to pay.

In July 2004, DB made a demand upon AAC, pursuant to the Guarantee, to pay the amount DB believed it was owed by ACP for the Solutia Credit Event. AAC refused to make such a payment.

*The Parties' Expectations Regarding the Settlement Date*

The parties' conversations and correspondence from the Delivery Date and the months that immediately followed it demonstrate that neither DB nor ACP believed that the Confirmation had established an open-ended delivery window. For example, on February 4, Jennifer Jillson, a member of DB's Bond and Equity Support group, sent e-mails to others within the company regarding DB's contracts for Solutia Bonds, including the Physical Settlement and the transaction with JPMC. She noted that the JPMC transaction was "settling today," that it was associated with a credit event, and as a result it was "important that the settlement [with JPMC] occurs." Also on February 4, ACP's Gleeson sent an e-mail in which he detailed the logistics of obtaining the $8,771,000 to pay DB, and noted that ACP would be "required to settle [the Solutia] credit event *today*." (Emphasis supplied.)

In the three months that followed ACP's March 4 refusal to accept the Deliverable Obligation, representatives of DB and ACP engaged in multiple conversations regarding possible compromise arrangements that would not result in such a substantial loss for DB. In these conversations, DB urged ACP to accept the bonds on the basis of the long-standing relationship between the companies, and it threatened to cut off all business with Ambac if ACP stood by its decision. In none of these exchanges, however, did DB contend that ACP had been *contractually obligated* to accept the Solutia Bonds on March 4.[FN9]

> **FN9.** DB's internal communications from this period also reflect a belief that ACP had not violated the contract when it refused delivery. For example, on March 11, Nicola Harrison ("Harrison"), a DB managing director and the global head of the Alternative Risk Markets Group, e-mailed a colleague to explain the dispute with ACP. Harrison noted that because DB did not provide Ambac with any loans, "we have no leverage here at all."

There is also no evidence that DB ever believed that Ballard's early February telephone conversation with ACP had given DB more leeway as to the Delivery Date. For 12 weeks after ACP's refusal, DB made *no mention* of the con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ference call, which it now alleges provided it with an indefinite extension of the Delivery Date. Indeed, shortly after ACP refused delivery of the bonds, Horn, a director of Deutsche Bank Securities, a subsidiary of DB, put together a timeline of salient events related to the Solutia credit event. Although the chronology includes nearly a dozen occurrences, the early February call is not among them. It appears, therefore, that at the time of the Physical Settlement, both DB and ACP understood the Confirmation to require delivery no later than February 11, or five business days after the Delivery Date of February 4.

*Industry Practice*

**\*8** DB argues that even if the terms of the Confirmation appear to establish a firm delivery date, the common practice of those in the CDS industry at the time of the Triplets transaction was to be flexible with respect to the delivery of bonds and other obligations. The evidence, however, compels precisely the opposite conclusion.

West, one of defendants' two expert witnesses testified that, in his experience working on hundreds of CDS transactions subject to the 1999 Definitions, no party ever discussed-much less agreed to-the possibility of allowing delivery of an obligation at any time during a multi-year portfolio transaction. Similarly, Swain, defendants' second expert, testified that he participated in hundreds of single-name and portfolio CDS transactions for Assured, and that he was unaware of even a single time that a protection buyer insisted that it could deliver a security after the delivery date. To the extent that a practice of leaving trades open until the bonds were delivered existed at all, Swain stated that it did not apply to transactions involving non-dealer protection sellers like ACP. Indeed, on two or three occasions, protection buyers asked Assured to accept late delivery of their obligations, and Assured consistently refused.

There is a compelling economic reason for parties to expect that delivery deadlines in a CDS transaction will be inflexible. In such transactions, the protection seller agrees to take on a precisely defined level of risk, for which it is paid an amount determined by its underwriting calculations. An open-ended delivery deadline would make such fine-tuned calculations difficult. As a result, a protection seller is highly unlikely to provide this sort of coverage without an express discussion of its parameters and the associated additional premium.

The evidence submitted by DB to rebut the testimony of defendants' experts is flimsy at best. DB relies primarily on its own employees' self-serving assertions that CDS market practice allows for sufficient time after a scheduled delivery date for the deliverable obligations to be obtained and transferred. These employees, however, identify only a handful of specific CDS transactions in which a deliverable obligation was accepted after it was due-and in none of these instances was a non-dealer like ACP a party. [FN10] DB's testimony from an expert who is not a DB employee is equally unavailing. Sloan, previously the chief administrative officer of M. Safra & Company, a hedge fund manager, testified that "[m]arket practice in late 2003 and 2004 in the bond market regarding bond trades and bond settlements was that the party receiving the bonds did not cancel the trade if delivery was not made on the scheduled settlement date." Although Sloan stated that "operations departments did not differentiate between the settlement of bond transactions related to derivatives and settlement of straightforward bond transactions," she was offered as an expert on the bond market, not on CDS transactions. Indeed, she admitted that she was not qualified to answer questions about such transactions. Therefore, her testimony is of minimal relevance here.

> FN10. Swain testified that this fact is of some significance. Dealers, such as banks and brokerage firms, usually engage in a high volume of CDS transactions, and may act as a buyer and seller of protection with respect to the same security. Non-dealers, however, typically engage in a much lower volume of transactions and do not act both as a protection buyer and protection seller with respect to the same security. Therefore, industry practices for transactions between two dealers would not necessarily mirror those for transactions involving a non-dealer.

**\*9** Moreover, there is a reason why market practices in the CDS and bond markets are not, in fact, identical. In typical corporate bond transactions, the buyer of the bond has

chosen to make the purchase and begins to earn interest on the delivery date, regardless of when physical delivery actually occurs. In a CDS transaction, however, the protection seller does not want the bonds; it accepts them only because it must do so pursuant to the relevant confirmation. In such transactions, delivery is triggered by a credit event, which in most cases means that interest may have ceased to accrue.

Imposing a definite and tight timeframe for delivery has particular benefits for the seller of protection that do not pertain to the regular bond market. If the bond is one of those that is covered by many CDS transactions, as it appears may have been the case with the Solutia Bonds, then more bonds may be sought than are available in the market. When that happens, the buyer may be unable to obtain the bonds by the delivery date, relieving the seller entirely of its obligation to pay, or if the bonds are timely delivered, the intense bidding for those bonds may create a relatively inflated market price, allowing the credit seller to recover some of its loss by reselling the bonds quickly before the market price collapses.

And, most significantly, unlike ordinary bond transactions, CDS transactions are governed by detailed contracts that incorporate a fixed timetable for delivery. The evidence therefore clearly establishes that at the time of the Triplets transaction, it was the practice of the CDS marketplace to require compliance with physical settlement deadlines.

### CONCLUSIONS OF LAW

DB brings claims for breach of contract and breach of the implied covenant of good faith and fair dealing against both defendants. It also brings a claim for equitable estoppel against ACP.

### I. Breach of Contract

#### A. General Standard

Under New York law, to make out a claim for breach of contract, a plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co., 375 F.3d 168, 177 (2d Cir.2004).* Of

course, if the conditions precedent to a defendant's duty to perform have not been met, breach is not possible. *See, e.g., Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 597 (2d Cir.2005)* ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.").

Here, DB alleges that ACP failed to fulfill its contractual obligation under the Confirmation and 1999 Definitions to make payment in exchange for DB's delivery of the Solutia Bonds. ACP argues, in effect, that because DB did not deliver the deliverable obligation by February 4, or within the five-business-day grace period, it did not satisfy a condition precedent to ACP's duty to pay, and therefore a breach of contract claim cannot lie. The central question, then, is whether the Confirmation (read in conjunction with the Master Agreement and the 1999 Definitions) required DB to make delivery by the Delivery Date in order for ACP to be obligated to make payment, or whether it allowed for a longer delivery window, either by its explicit terms, or because of the customs and practices of the credit derivative marketplace.

**\*10** Under New York law, the ultimate goal of contract interpretation is to construe agreements "in accord with the parties' intent." *Eternity Global, 375 F.3d at 177* (citation omitted). When interpreting a contract,

words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir.2005)* (citation omitted). When a transaction involves multiple writings that "are designed to effectuate the same purpose, [they] must be read together, even though they were executed on different dates and were not all between the same parties." *TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir.2005)* (citation omitted). If there are ambiguities in an agreement that cannot be resolved by reference to other cannons of contract interpretation, these "[a]mbiguities are generally in-

Slip Copy                                                                                                      Page 9
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

terpreted against the drafter." *RLS Associates, LLC v. United Bank of Kuwait PLC,* 380 F.3d 704, 712 (2d Cir.2004).

### B. Terms of the Confirmation

DB contends that, by the terms of the Confirmation, it had until May 2, 2005 to deliver the Solutia Bonds-that is, more than one year later than the date on which it actually tendered the securities. The basis for this claim is the Confirmation's definition of "Termination Date" as "the later to occur of the Scheduled Termination Date and final Physical Settlement Date." According to DB, the earliest possible Termination Date under the Confirmation, then, is May 2, 2005, which is identified as the Scheduled Termination Date. DB further argues that this definition of Termination Date contradicts Section 9.3(c)(ii) of the 1999 Definitions, which states that if a buyer fails to deliver an obligation, the last day of the five-business-day window becomes the Termination Date. According to DB, since terms in the Confirmation trump those in the 1999 Definitions, this effectively eliminates the requirement that the Deliverable Obligation be delivered within five days of the Physical Settlement Date.

To be sure, the Confirmation is drafted imperfectly and creates ambiguity regarding the interplay of the Termination Date and Physical Settlement Date, but under DB's interpretation of the documents, this ambiguity would all but swallow the agreement, creating many more problems than it resolves. The ambiguity stems from the fact that in the 1999 Definitions, Termination Date has two distinct meanings: It refers to the date on which protection for the single reference entity ends, and the date on which the entire transaction terminates. Because the 1999 Definitions address a single-obligation transaction, these two dates are the same, and a timely physical settlement (or failure to make timely delivery of a NIPS or an obligation) always ends not only the protection for a single reference entity, but also the entire transaction. Therefore, the 1999 Definitions do not differentiate between these two meanings of Termination Date. In a portfolio transaction, however, the buyer has purchased protection for multiple securities. So while both ACP and DB intended that a single physical settlement (or failure to deliver either a NIPS or bonds within the time allowed)

would terminate protection for that obligation, they did not intend it to end the Triplets transaction altogether. The confusion here arises from the parties' failure to differentiate these two meanings of Termination Date and provide them with separate names.

**\*11** Nonetheless, it is not difficult to discern the parties' intent by reading the Confirmation and the 1999 Definitions together, and by analyzing the context in which critical terms are used. Beginning with the Confirmation, it is clear that DB and ACP intended the Termination Date to define the end point of the entire transaction. It is for this reason that it is among the first three defined terms in the Confirmation, coming immediately after "Effective Date," the date on which the transaction begins. Thus, Triplets, with an Effective Date of May 2, 2000 and a Scheduled Termination Date of May 2, 2005, was designed to be a five-year transaction.

There is ample evidence that the parties anticipated that there could be many distinct physical settlements of individual securities on separate physical settlement dates within this five-year term. In the section regarding conditions to payment, for example, the Confirmation provides: "For the avoidance of doubt, Conditions to Payment may be satisfied more than once with respect to this Transaction; provided, however, that the Conditions to Payment may be satisfied only once with respect to each Reference Entity." Similarly, the Confirmation's definition of the Termination Date refers to the "*final* Physical Settlement Date," in recognition of the fact that there could be multiple physical settlement dates during the contract period. (Emphasis supplied.) In other words, it is clear from the Confirmation that the parties aimed to create what were, in effect, 60 *separate* five-year CDS transactions documented with a single agreement. This allowed DB to retain coverage for the remaining reference obligations even after others had been physically settled.

DB attempts to create doubt about the parties' intent by pointing out that the Termination Date arises in the context of Section 9.3(c)(ii) of the 1999 Definitions, specifically the second sentence in which the consequences of a failure to make a timely delivery are spelled out. The first sentence of the Section establishes that the buyer can continue to make delivery attempts of the deliverable obligation for five busi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ness days after the Physical Settlement Date. The second sentence states that if the buyer fails to make delivery during this time, the fifth day after the Physical Settlement Date "shall be deemed to be the Termination Date." As DB correctly points out, this last phrase contradicts the definition of Termination Date laid out in the Confirmation, since on its face it would require the entire Triplets transaction to end if DB failed to deliver a single deliverable obligation within the five-day window.

DB's solution to this apparent contradiction, however, is based on an untenable reading of the Confirmation and the 1999 Definitions. DB argues that because, under Section 9.3(c)(ii), a failure to deliver causes the last day of the delivery window to become the Termination Date, "the Termination Date is therefore the last day that the bonds can be delivered under the Confirmation." And since the Confirmation states that the Termination Date can come no earlier than May 2, 2005, DB could not have been required to deliver the Solutia Bonds before that date. This argument is logically flawed. Just because the failure to deliver on the last permissible day can, in a single-obligation transaction, result in that day being deemed the Termination Date, it does not follow that the Termination Date is the last day on which an obligation can be delivered. Indeed, DB has pointed to no language in either the 1999 Definitions or the Confirmation indicating that Termination Date should have this meaning, and thereby extend the delivery period. While the second sentence of this section identifies the consequence of a delivery failure, the first sentence defines the duty, that is the period in which delivery must be made. A change in the consequences does *not* change the duty.

**\*12** Pointedly, the Confirmation makes no change to Section 8.1 of the 1999 Definitions (which makes payment due upon delivery "on or prior to the Physical Settlement Date"), Section 8.5 (which defines the Physical Settlement Period), or the first sentence of Section 9.3(c)(ii) (which extends the Physical Settlement Date by five days). If DB had intended to expand the timetable for delivery, it would have modified terms affecting at least these sections of the 1999 Definitions. Simply put, the Confirmation does not reflect an intention to leave the delivery window open.

The better reading of the Confirmation's definition of Ter-

mination Date takes into account the fact that the parties intended to establish separate coverage for each of the 60 securities. As noted above, DB and ACP agree that physical settlement of one security was not intended to result in termination of the entire Triplets transaction. Indeed, DB had already been paid by ACP on eight separate Reference Entities that had been subject to credit events without triggering the termination of the Triplets contract. It is reasonable, then, to infer that a failure to make timely delivery of a single deliverable obligation was not meant to affect the coverage of the other securities. The issue therefore becomes what consequences flow from a failure to deliver securities within the five-day window established by Section 9.3(c)(ii).

DB takes the wholly implausible position that there are *no* consequences. It argues that under Section 9.3(c)(ii), untimely delivery would result in termination of the transaction; and because the Confirmation establishes that Triplets cannot end until May 2, 2005 at the earliest, that portion of Section 9.3(c)(ii) is overridden. According to DB's reading of the documents, then, the parties intended to permit either party to start the clock ticking through the delivery of a Credit Event Notice, to set a 30-day window in which to deliver a NIPS,[FN11] and to establish a precisely negotiated physical delivery period based on market practice-but if DB failed to delivery either a NIPS or the bonds within the designated time, it would suffer no adverse consequences at all.

> [FN11]. Under Section 3.4, if a NIPS is not delivered within 30 days, the thirtieth day is deemed the Termination Date.

DB's interpretation is plainly wrong. In a single-security transaction governed by the 1999 Definitions, any failure to adhere to the detailed credit-event timeline results in the coverage for that security being terminated. There is no evidence that the parties to the Triplets transaction intended to take what was once a mandatory timeline and eviscerate it. The Confirmation explicitly acknowledges both parties' rights to start the timetable for delivery of a NIPS and the securities. With DB's reading, there is essentially no timetable, and ACP loses its right to trigger the countdown for delivery. Such a result should be avoided. Contracts should be read as a whole, with an eye toward giving effect

Westlaw.

Slip Copy                                                                                                                Page 11
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

to every provision. *State Street Bank and Trust Co. v. Salovaara,* 326 F.3d 130, 139 (2d Cir.2003). The best reading of the agreement, then, is that a failure to make timely delivery with respect to a single security terminates the credit protection with respect to that security, but not with respect the rest of the transaction.

**\*13** This reading has several advantages. It accords with the intent of both parties.<u>FN12</u> It reflects their contemporaneous understanding of the operation of their contract. It makes commercial sense. And, as described below, it accords with industry practice.

> <u>FN12.</u> In summation, plaintiff's counsel acknowledged that in drafting the Confirmation, DB had not anticipated how its change in the definition of Termination Date would impact the parties' rights when a security was not timely delivered.

### C. Industry Practice

When attempting to determine the parties' intent, courts look first to the contract itself. "[I]f an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Eternity Global,* 375 F.3d at 177 (citation omitted). If a contract is ambiguous, however, a court may look to extrinsic evidence "to ascertain the correct and intended meaning of a term or terms." *Id.* at 178 (citation omitted). The ambiguity need not appear on the face of the contract, but may exist if a term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* (citation omitted).

Here, as noted above, there is some ambiguity regarding the interpretation of the Termination Date. Although the Confirmation and 1999 Definitions alone would not support DB's position that the delivery window was to remain open until it obtained the necessary securities form other counterparties, DB claims that industry practice backs up this interpretation. In the context of a sale of goods, in order to affect

contract interpretation, an industry practice must have "such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." *Aceros Prefabricados, S.A. v. TradeArbed, Inc.,* 282 F.3d 92, 102 (2d Cir.2002) (citing N.Y. U.C.C. § 1-205(2)). "[I]t is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to justify an expectation of its observance." *Id.* (citation omitted). Those principles will be applied here.

Here, DB has utterly failed to show the existence of a market practice for credit default instruments that would have justified an expectation that it had an unlimited delivery window absent an express provision to that effect in the Confirmation. Its sole retained expert candidly admitted that she has no expertise whatsoever in the field of credit default obligations and did not disagree with any of the statements or analysis by ACP's expert, whose expertise within the field of credit default transactions was well established and unchallenged. At most, its own employees pointed to a handful of isolated CDS transactions in which late delivery of a physical settlement obligation was accepted. In none of these transactions was a non-dealer a party, and their relevance is therefore marginal at best. ACP, on the other hand, has shown through compelling evidence that the firm practice in the CDS marketplace was to require that delivery occur according to the timetable to which the parties had agreed. Under these circumstances, DB could not reasonably have expected that ACP would accept delivery after February 11-and should have expected just the opposite.

**\*14** Indeed, the evidence shows that DB itself understood in February 2004 that it had a firm obligation to deliver the Solutia Bonds by the date it identified in the NIPS it sent to ACP, or within the five-business-day window that followed. In March, April, and May, as executives in the companies discussed ACP's refusal to accept DB's late-tendered bonds, DB never took the position that ACP was contractually bound to accept them. In fact, in a candid internal communication, it conceded it had "no leverage ... at all" in the negotiations.

### D. Waiver

DB claims that even if the Confirmation required it to deliver the Deliverable Obligation by February 4 or 11, ACP waived its right to insist on compliance with that provision during the tape recorded conference call, which it asserts occurred on February 9, but which most likely occurred on February 4. Waiver occurs when a party to a contract "intentional[ly] relinquish[es] ... a known right." *Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 968 (1988).* Once this occurs, the waiving party can no longer insist on strict performance of the relevant contractual duties. *13 Williston on Contracts § 39:27 (4th ed.2000).* Waiver may be made by express declaration or may be inferred from a party's actions. Because the effect of waiver is to eliminate otherwise valid contractual provisions, however, it is not "lightly presumed." *Gilbert Frank, 70 N.Y.2d at 968.* "Intent to waive will not be inferred from doubtful or equivocal acts or language; rather, in the absence of an express declaration ..., there must be a clear, unequivocal, and decisive act of the party who is claimed to have waived its rights that no other reasonable explanation is possible." 13 Williston at § 39:28; *accord Lamborn v. Dittmer, 873 F.2d 522, 529 (2d Cir.1989).*

Under this standard, DB's claim that ACP waived its right to insist upon early-February delivery clearly fails. FN13 The conversation between Campbell and Ballard involved precisely the sort of "doubtful or equivocal acts or language" that cannot serve as the basis for waiver. Their discussion, which focused on operational details of the physical settlement, was casual; and Campbell's statement that it would be "no problem" if ACP received the Solutia Bonds in the next two days was an off-hand remark that cannot reasonably be construed as an express declaration of waiver. But even *if* the conversation had been more concrete, the call still would not have constituted a waiver of ACP's right to insist on delivery within the five-business-day window for three additional reasons: (1) Neither Ballard nor Campbell and Gleeson were authorized (or appeared to be authorized) to make material alterations to the Confirmation; (2) the Confirmation could not be modified, except in writing; and (3) it is clear that, to the extent Campbell consented to anything, he agreed to nothing more than that DB would be allowed to deliver the Solutia Bonds "in the next day or two"-that is, within the five-day window, which was to expire two days

later (if the call occurred on the date DB has identified).

> FN13. Although it is not entirely clear from its briefs, DB appears to argue that ACP's failure to "demand immediate performance" between February 9 and February 26 (the day ACP instructed the Bank of New York not to accept DB's tender) constituted a waiver, as well. It did not. Nothing in the Confirmation or the 1999 Definitions obligates the protection seller to notify the protection buyer of its expectations regarding the timing of physical settlement. After all, it is the *protection buyer* who sets that schedule through delivery of the NIPS. Furthermore, after February 11, ACP was not contractually obligated to accept the Solutia Bonds, so its failure to demand delivery after that date cannot fairly be interpreted as a waiver of any rights.

1. Lack of Authority to Modify the Confirmation

**\*15** Under common law agency principles, an organization is liable for contractual obligations incurred by someone who has actual, apparent, or implied authority to consent on its behalf. *F.T.C. v. Verity Intern., Ltd., 443 F.3d 48, 64 (2d Cir.2006)* (citing *Restatement (Second) of Agency § 140 (1958)*). Here, the participants in the February 9 call lacked actual authority to negotiate contracts on behalf of their respective employers. DB relies on apparent authority. "For apparent authority to exist, there must be words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal." *Cromer Finance Ltd. v. Berger, 137 F.Supp.2d 452, 486 (S.D.N.Y.2001)* (citation omitted). That is, if ACP had communicated to DB, either implicitly or explicitly, that Campbell or Gleeson were empowered to alter the terms of the Confirmation, the conversation might have resulted in changes to the agreement. DB, however, has submitted no evidence to support this contention. DB's suggestion that Campbell and Gleeson created the impression that they had the necessary authority to alter the Confirmation merely by stating that they were "representatives of Ambac" is absurd. Furthermore, this was a conversation between employees involved in the *operations* of both companies; they were not the high-level executives that one would reasonably expect

Slip Copy                                                                                                              Page 13
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

to negotiate the terms of a multi-million-dollar contract. Therefore, even if the conversation had been less casual and equivocal, it could not have yielded a binding, material change to the rights and obligations of the parties under the Confirmation.

### 2. No Oral Modifications Clause

Section 9(b) of the Master Agreement provides that "No amendment, modification or waiver in respect of this Agreement will be effective unless in writing ... and executed by each of the parties." Pursuant to N.Y. Gen. Oblig. Law § 15-301(1), New York "enforces such requirements and does not permit oral modification when the original written agreement provides that modifications must be in writing and signed." John Street Leasehold LLC v. FDIC, 196 F.3d 379, 382 (2d Cir.1999).

There are, however, two situations in which New York law enforces oral modifications notwithstanding a contractual clause requiring alterations to be in writing: "where there has been (1) partial performance or (2) reliance-but only where the subsequent performance or reliance is unequivocally referable to the modification." *Id.* (citation omitted). DB alleges that the second exception is implicated here. It has not, however, provided *any* evidence of its reliance on the conversation. Indeed, Ballard himself testified that after the conversation occurred, he recorded it in DB's internal system, but did not tell anyone else in the company about it. And DB has not produced a single additional employee who was aware of the conversation prior to June. DB has admitted in its trial papers that it simply followed its usual practice in waiting for the Solutia Bonds to arrive. As a result, to the extent Campbell's statement could be construed as an attempt to modify the Confirmation, it could not be given effect because of the Master Agreement's prohibition on oral modifications.

### 3. Campbell's Statement

**\*16** In any event, DB's insistence upon advancing the waiver argument is perplexing, given the actual content of the conversation. DB's position rests almost entirely upon the fact that Campbell said "Okay, no problem" in response to Ballard's suggestion that DB would deliver the Solutia

Bonds "in the next day or two." Even if this exchange could be construed as a binding agreement between DB and ACP, it would not have provided DB with the open-ended extension it now claims to have received. A colorable argument could perhaps be made that "the next day or two" is colloquially understood to mean "soon" and that the statement therefore did not limit DB's delivery window to precisely 48 hours. Under no circumstances, however, could "the next day or two" be fairly interpreted to cover DB's actual delivery of the Solutia Bonds, which did not take place until approximately *four weeks* later.

DB was therefore required to deliver the Solutia Bonds within the five-business-day grace period after the delivery date of February 4. Because DB failed to fulfill that condition precedent, ACP was under no contractual duty to pay, and DB's claim that ACP breached the Confirmation fails. Furthermore, since ACP was not obligated to pay DB under the Confirmation, AAC incurred no obligation pursuant to the Guarantee. Therefore, the breach of contract claim against AAC fails, as well.

### II. Implied Covenant of Good Faith and Fair Dealing

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995). Each promisor must exercise good faith with respect to "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (citation omitted). In addition, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* The covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Systems Corp.* 418 F.3d 187, 198-99 (2d Cir.2005) (citation omitted). In other words, if a contractual term applies, a plaintiff cannot replace a failure to show a breach of contract by referring to the implied covenant. *See, e.g.,* State Street Bank and Trust Co. v. Inversiones Errazuriz, 374 F.3d 158, 170 (2d Cir.2004) (holding that "[w]here a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do

Slip Copy                                                                                                     Page 14
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**

so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent").

DB attempts to circumvent this prohibition by arguing that its breach of contract claims arise out of ACP's refusal to pay for delivery of the Solutia Bonds, while its claim for breach of the implied covenant is based on two actions that the terms of the Confirmation did not explicitly cover: (1) ACP's "misleading" statement that it "would still accept the bonds after February 4," and (2) its "secret[ ]" withdrawal of delivery instructions from the Bank of New York on February 26. As an initial matter, DB's argument that these are not the "same facts" is tenuous at best. After all, DB contends that the telephone conversation induced it to make a late delivery, and the breach of contract claim would never have arisen at all if ACP had not instructed the Bank of New York to refuse DB's tender. Therefore, the claim of breach of the implied covenant fails as a matter of law.

**\*17** Even if it were not legally faulty, DB's claim fails because ACP did not actually breach the implied covenant of good faith and fair dealing. First, it was not "misleading" for ACP to say that it would accept the Solutia Bonds after February 4, since it was contractually obligated to accept them until February 11. Second, because it was not contractually required to accept delivery after February 11, ACP was under no obligation to inform DB of its decision to withdraw its authorization from the Bank of New York.[FN14] Finally, ACP has submitted ample evidence that it acted cautiously in responding to DB's late delivery. Soon after DB attempted to deliver the Deliverable Obligation on March 4, Cynthia Parker and other ACP employees began asking colleagues in the industry whether ACP was within its rights to decline to accept the bonds. They appear to have made these inquiries in good faith and determined that ACP's actions were consistent with industry practice. Indeed, ACP waited until April to make its final decision to refuse payment on the bonds. Therefore, it did not breach the implied covenant of good faith and fair dealing.

> FN14. In any event, Solutia Bonds were difficult to obtain during this period. Therefore, even if DB had known of ACP's intention to withdraw its authorization from the Bank of New York, it is by no means clear that it would have been able to obtain

the necessary quantity of bonds from other sources more quickly than it did from CSFB and JPMC.

### III. Equitable Estoppel

Under New York law, a party claiming equitable estoppel must show that the opposing party: (1) engaged in "conduct which amounts to a false representation or concealment of material facts"; (2) intended that this conduct would be "acted upon by the other party"; and (3) had "knowledge of the real facts." *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir.2003) (citation omitted). With respect to itself, the party must show: "(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *Id.* at 94.

DB claims that ACP should be estopped from refusing delivery of the bonds because it led DB to believe that it would accept the Deliverable Obligation after the Physical Settlement Date. The bulk of this argument has been addressed elsewhere in the Opinion. Here, it is sufficient to observe that DB has utterly failed to carry its burden of demonstrating that ACP intended to induce DB to make a late delivery, or that DB actually relied on any of ACP's statements or actions in determining how and when to settle the transaction. The claim for equitable estoppel therefore fails.

### Conclusion

For the foregoing reasons, each of DE's claims is denied in its entirety. The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED.

S.D.N.Y.,2006.
Deutsche Bank AG v. AMBAC Credit Products, LLC
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 462333 (Trial Pleading) Second Amended Complaint (Feb. 14, 2006)

• 2005 WL 3076328 (Trial Pleading) First Amended Com-

Westlaw.

Slip Copy                                                                                                                    Page 15
Slip Copy, 2006 WL 1867497 (S.D.N.Y.)
**(Cite as: Slip Copy)**


plaint (Nov. 7, 2005)

• 2005 WL 3647768 (Trial Pleading) First Amended Complaint (Nov. 7, 2005)

• 2005 WL 1667515 (Trial Motion, Memorandum and Affidavit) Responsive Memorandum of Law in Support of Defendants' Motion for Summary Judgment or to Preclude the Admission of ""Usage of Trade" Evidence and in Opposition to Plaintiff'S Cross-Motion for Leave to Amend the Complaint (Jun. 3, 2005)

• 2005 WL 1224596 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment or to Preclude the Admission of ""Usage of Trade" Evidence and in Support of Plaintiff's Cross-Motion for Leave to Amend the Complaint (May 13, 2005)

• 2005 WL 831438 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion for Summary Judgment or to Preclude the Admission of ""Usage of Trade" Evidence (Apr. 4, 2005)

• 2004 WL 1735222 (Trial Pleading) Complaint (Jul. 19, 2004)

• 1:04cv05594 (Docket) (Jul. 19, 2004)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626
(Cite as: Not Reported in F.Supp.)

H

Briefs and Other Related Documents

United States District Court, S.D. New York.
Cynthia GREGORY, Plaintiff,
v.
SIMON & SCHUSTER, INC., Defendant.
No. 93 CIV. 4674 (JSM).

July 19, 1994.

MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

*BACKGROUND AND FACTS*

**\*1** This is a dispute over the terms of a publishing agreement entered into by the plaintiff, Cynthia Gregory ("Gregory"), and defendant Simon & Schuster, Inc. ("S & S"). Gregory, who retired from her career as a ballet dancer in 1992, is also the author of two books previously published by S & S. In 1986, S & S published *Ballet Is the Best Exercise,* written with a collaborator, which chiefly consisted of photographs of Gregory performing exercises she had designed. In 1990, S & S published *Cynthia Gregory Dances Swan Lake,* a children's book.

Between January and April, 1990, Judith Regan ("Regan"), an editor in S & S's Pocket Books Division, and William Grose ("Grose"), the Editorial Director for Pocket Books, met with plaintiff and her attorney to discuss Gregory's writing her memoirs and publishing them with S & S. Some time in March or April, 1990, plaintiff submitted a proposed outline and sample materials for a book tentatively entitled *Black and Blue Swan* to Regan. At the end of April, the parties began contract negotiations, and they executed a publishing agreement on May 14, 1990 (the "Agreement").

The basic terms of the Agreement provided for Gregory to deliver on or before September 30, 1991 a complete manuscript of approximately 120,000 words "reasonably satisfactory" in content and form to the publisher.[FN1] *See* Defendant's Exhibit 1, ¶ 2(a). S & S agreed to pay Gregory a total advance of $400,000 against anticipated royalties from sales of the book, to be paid according to the following

schedule: the first $120,000 upon signing the Agreement; the second $120,000 "on acceptance by Publisher of the complete manuscript for the Work as satisfactory to Publisher in content and form"; $80,000 on the publication of the hardcover edition or 12 months after acceptance, whichever was earlier; and another $80,000 on the publication of the paperback edition or 24 months after acceptance, whichever was earlier. *See* Defendant's Exhibit 1, ¶ 3. The Agreement gave defendant the right to terminate the contract if it determined in its bona fide editorial judgment that the "final revised complete manuscript" was not "reasonably satisfactory". *See id.,* ¶ 9(a). Pursuant to the Agreement, S & S paid plaintiff the first $120,000 installment of the advance when they signed the contract.

While there is some dispute as to what happened after the parties signed the Agreement, the following facts are not in dispute. Gregory submitted her first manuscript, which she wrote with the assistance of a collaborator she had picked herself, in early October 1991. S & S did not accept the manuscript, and Regan suggested that Gregory work with a different collaborator, Larry Kaplan ("Kaplan"), who had previously worked with the ballet dancer Edward Villella on his memoirs.[FN2] Gregory and Kaplan submitted two more manuscripts, each of which Regan deemed unsatisfactory and sent back for rewriting. In June 1993, S & S notified plaintiff that it was terminating the contract pursuant to ¶ 9(a) of the Agreement.

**\*2** Plaintiff commenced this action in July, 1993, seeking payment of the $280,000 balance of the advance and alleging that the defendant had breached the Agreement and violated the Connecticut Unfair Trade Practices Act ("CUTPA").[FN3]

Plaintiff has now moved for summary judgment on all of her claims pursuant to Fed.R.Civ.P. 56. Defendant has cross-moved for summary judgment on several grounds. First, S & S contends that it fulfilled its obligations under the Agreement and is therefore entitled to summary judgment dismissing the entire complaint. In the alternative, S & S contends that any recovery Gregory may obtain is limited by the liquidated damages clause contained in ¶ 9(a) of the Agreement. Additionally, S & S moves for summary judgment dismissing the CUTPA claim. For the reasons stated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626
(Cite as: Not Reported in F.Supp.)

below, plaintiff's motion is denied in its entirety and defend-
ant's cross-motion is granted in part.

## DISCUSSION

### Summary Judgment

Summary judgment is proper when there is no genuine issue
of material fact and, based upon facts not in dispute, the
moving party is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317,
322-23, 106 S.Ct. 2548 (1986). The court's role on a motion
for summary judgment is not to decide disputed issues of
fact but only to determine whether there is a genuine issue
to be tried. *Rattner v. Netburn,* 930 F.2d 204, 209 (2d
Cir.1991). Moreover, the court must resolve all ambiguities
and draw all factual inferences in favor of the nonmoving
party. *Rattner,* 930 F.2d at 209 (citing *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).
Summary judgment may be granted "against a party who
fails to make a showing sufficient to establish the existence
of an element essential to that party's case." *Celotex,* 477
U.S. at 322, 106 S.Ct. at 2552.

### The Breach of Contract Claim

Plaintiff asserts that S & S breached the Agreement in sev-
eral respects. First, plaintiff argues that S & S prevented
Gregory's performance and committed an anticipatory
breach by terminating the Agreement before S & S had
provided her with the editorial assistance it allegedly owed
her under the contract and before Gregory had submitted a
"final revised complete manuscript," as required by ¶ 9(a) of
the Agreement. In the alternative, plaintiff argues that de-
fendant nonetheless breached the contract by failing to
provide her with reasonable editorial assistance. Finally,
plaintiff contends that S & S's rejection of the manuscript
and termination of the Agreement was objectively unreason-
able and therefore violated ¶ 9(a) of the Agreement, which
allows termination of the contract if the "final revised com-
plete manuscript" is not "reasonably satisfactory to [the]
Publisher."

The standard publishing agreement grants publishers wide
discretion in the performance of their obligations. The

standard contract requires an author to deliver within a spe-
cified period of time a manuscript "satisfactory to Publisher
in content and form." *See Doubleday & Co., Inc. v. Curtis,*
763 F.2d 495, 497 (2d Cir.1985), *cert. dismissed,* 474 U.S.
912 (1985). This language has been interpreted to require
the publisher to act in good faith and to terminate the agree-
ment only as a result of "honest dissatisfaction" with the au-
thor's work. *Id.* at 500-01. Further, the standard agreement
imposes no duty regarding editorial services other than a
duty to act in good faith. *See id.* at 500.

**\*3** Here, the parties expressly modified the duties usually
contained in the standard form. Defendant agreed to provide
"reasonable editorial assistance" in the event that the
manuscript plaintiff submitted was not satisfactory. Para-
graph 10(a) of the Agreement provides that in the event the
"complete manuscript" is not "satisfactory to the Publisher,"
Publisher shall give the Author at least one opportunity to
make revisions, changes or supplements thereto. Publisher
shall notify Author of the particular respects in which the
manuscript is not satisfactory and of Publisher's suggested
revisions, and Publisher shall provide Author with reason-
able editorial assistance in connection therewith.

Defendant's Exhibit 1, ¶ 10(a). The parties also added the
qualifier "reasonably" to the standard "satisfactory to the
publisher" language, so that S & S could terminate the
Agreement if the "final revised complete manuscript" was
not "reasonably satisfactory to the Publisher." *See* Defend-
ant's Exhibit 1, ¶ 9(a).

At oral argument, defendant's counsel conceded that the
question of whether or not S & S rendered "reasonable edit-
orial assistance" pursuant to ¶ 10(a) was a genuine issue of
material fact which could not be decided on a motion for
summary judgment. Accordingly, both plaintiff's motion
and defendant's cross-motion for summary judgment on the
breach of contract claim are denied.

Plaintiff's two remaining theories are without merit.
Plaintiff's claim that defendant acted unreasonably in reject-
ing her manuscript is based on an unreasonable interpreta-
tion of the meaning of "reasonably satisfactory to the Pub-
lisher." Plaintiff contends that the manuscripts she submit-
ted comported in quality, style and substance with the out-

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626
**(Cite as: Not Reported in F.Supp.)**

line and sample materials she had submitted prior to execut-
ing the Agreement, as well as with the quality of the previ-
ous ballet memoir co-written by her collaborator, Larry Ka-
plan, and therefore, S & S acted unreasonably in rejecting
her manuscripts. Acceptance of plaintiff's argument would
require a construction of the term "reasonably satisfactory to
the Publisher" to mean comporting with her previously sub-
mitted materials. Although plaintiff contends that the lan-
guage of the Agreement itself incorporates by reference her
sample materials as the standard to which she would be
held, nothing in the Agreement references the sample materi-
als, except for the fact that the prefatory language refers to
the work by the tentative title submitted with the outline,
*Black and Blue Swan.* Thus, there is no need to look at the
extrinsic evidence plaintiff offers in her support because
there is nothing ambiguous about the Agreement on this
point.FN4

Moreover, the language of the Agreement does not hold de-
fendant to an objective standard of reasonableness despite
the addition of the term "reasonably". The entire standard,
as reflected by the language the parties chose, is "reasonably
satisfactory *to the Publisher.* " Thus, it is clear that, while S
& S may have incurred an obligation to act rationally and
not arbitrarily, the decision is still committed to the publish-
er's own judgment, not to some objective reasonable person
standard.

**\*4** The anticipatory breach claim also hinges on a patently
unreasonable interpretation of the language "final revised
complete manuscript." The Court's interpretation of the li-
quidated damages clause below is based on the same con-
clusion. The detailed discussion contained in the next sec-
tion of this opinion applies with equal force here.

*The Liquidated Damages Clause*

In its cross-motion, defendant asserts that, regardless of
whether or not she prevails on the merits of her claims, the
liquidated damages clause contained in ¶ 9(a) limits
plaintiff's recovery to the $120,000 advance she has already
received. In response, plaintiff contends that the liquidated
damages clause does not apply because none of the
manuscripts she submitted to defendant was a "final revised
complete manuscript" within the meaning of ¶ 9(a). Plaintiff

further argues that, even if the liquidated damages clause
does apply, she is not obligated to accept the $120,000 ad-
vance as the total of her damages because the option of
seeking actual damages remains available to her under the
language of ¶ 9(a).

The relevant language, contained in ¶ 9(a) of the Agree-
ment, provides:
If the final revised complete manuscript ... delivered by the
Author is not, in the Publisher's bona fide editorial judg-
ment, reasonably satisfactory to Publisher in content and
form, Publisher may terminate this Agreement ... In the
event of termination by the Publisher due to failure to accept
the final revised complete manuscript for any reason other
than ... based upon Publisher's bona fide editorial judgment,
Author may retain all sums theretofore paid by Publisher as
liquidated damages, Author's actual damages being difficult
or impossible to determine. In that event this agreement
shall terminate and all rights shall revert to Author.

Defendant's Exhibit 1, ¶ 9(a).

As a preliminary matter, the Court concludes that there can
be no genuine dispute as to whether plaintiff submitted a
"final revised complete manuscript" within the meaning of ¶
9(a). In deciding a dispute over the meaning of a contract,
the Court's primary objective is to give effect to the intent of
the parties as revealed by the language they chose to use.
*Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d
425, 428 (2d Cir.1992).* Summary judgment may be granted
when the language used in the contract conveys "a definite
and precise meaning absent any ambiguity" and no reason-
able basis exists for a difference of opinion about that mean-
ing. *Id.* Contract language that is clear and unambiguous is
not made ambiguous simply because the parties urge differ-
ent interpretations. *Id.*

The language in ¶ 9(a) must be read in conjunction with ¶
10, which governs defendant's editorial obligations after re-
ceipt of Gregory's "complete manuscript." Paragraph 10(a)
of the Agreement provides in relevant part:
Within 60 days after delivery of the complete manuscript ...,
Publisher shall determine whether the same [is] reasonably
satisfactory in content and form. If the complete manuscript
is not satisfactory to Publisher, Publisher shall give Author

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626

**(Cite as: Not Reported in F.Supp.)**

at least one opportunity to make revisions ... If Publisher requests one or more revisions in the complete manuscript of the Work ..., the Publisher's time to determine the satisfactoriness thereof shall be extended for an additional 45 days after resubmission by the Author.

**\*5** Defendant's Exhibit 1, ¶ 10(a). Thus, the Agreement expressly gives plaintiff at least one opportunity to revise her manuscript before S & S is allowed to make a final determination on the satisfactoriness of the work pursuant to ¶ 9(a). When read together, ¶¶ (a) and 10(a) unambiguously grant defendant the power to invoke the termination clause and reject any manuscript submitted after plaintiff has had at least one opportunity for revisions. Thus, any one of the manuscripts Gregory submitted after collaborating with Kaplan was a "final revised complete manuscript" within the meaning of ¶ 9(a).

To hold otherwise, and adopt the interpretation plaintiff urges, would render the termination clause meaningless and deprive defendant of its bargained-for ability to terminate the Agreement. As a general rule, a contract should be construed so as to give full meaning and effect to all of its provisions. *American Exp. Bank Ltd. v. Uniroyal, Inc.,* 562 N.Y.S.2d 613, 614 (A.D. 1st Dept.1990), *appeal denied,* 569 N.Y.S.2d 611 (1991). Under plaintiff's line of reasoning, the manuscript is not "final"-and thus ineligible for triggering the publisher's termination power-until the author has incorporated all of the editor's suggestions. This cannot be the intended meaning of the termination clause, which expressly contemplates a point at which the publisher no longer wants to allow the author more time to produce a satisfactory manuscript. If S & S were required to wait until the author did in fact successfully incorporate all of its suggestions, there would be no means of terminating the Agreement.

The Court's interpretation is further supported by the fact that plaintiff's counsel, in his communications with defendant and during discovery in this action, took actions and made statements revealing that he and his client considered the manuscript Gregory wrote with Kaplan a "final revised complete manuscript." In a letter written in July 1992, after Gregory and Kaplan had submitted a revised manuscript, plaintiff's attorney demanded a response from S

& S within the "contractual 45-day period." Defendant's Exhibit 7. The only 45-day period contained in the Agreement is the one in ¶ 10(a), which gives the publisher an additional 45 days to determine whether the revised manuscript is satisfactory. The invocation of the 45-day period is evidence that Gregory was aware her second submission was a final complete revised manuscript and intended it to a "final revised complete manuscript."

Moreover, in deposing Regan and questioning her regarding plaintiff's incorporation of her comments and suggestions into subsequent manuscripts, plaintiff's attorney consistently described the manuscript Kaplan and Gregory submitted as the "final manuscript." *See* Plaintiff's Exhibit M, Regan Dep. Tr. at 84, 86. Thus, there is no question that both parties, at least prior to this lawsuit, viewed the manuscripts Kaplan and Gregory submitted as "final revised complete manuscripts" within the meaning of ¶ 9(a).

**\*6** Since it is clear that defendant had the power to terminate the Agreement, the remaining issue is whether plaintiff is bound by the liquidated damages clause or whether she retained the option of seeking actual damages under the Agreement. The Court concludes that the language in ¶ 9(a) unambiguously bars plaintiff from recovering anything in excess of the $120,00 advance she has already received.

Pointing to the phrase "Author may retain" in ¶ 9(a), plaintiff argues that the plain language of the Agreement gives Gregory alone the option to elect liquidated damages as opposed to actual damages. The Court disagrees. The very fact that the provision was inserted in the Agreement at all demonstrates the parties' intent "to avoid litigation as to the quantum of damages." *Rubinstein v. Rubinstein,* 296 N.Y.S.2d 354, 360 (1968).

Moreover, plaintiff's interpretation would render the liquidated damages clause unenforceable and without effect. *See Stock Shop, Inc. v. Bozell and Jacobs, Inc.,* 481 N.Y.S.2d 269, 271 (Sup.Ct.1984) (finding liquidated damages clause in which plaintiff given option to disregard it and sue for actual damages invalid and unenforceable); *Jarro Bldg. Industries Corp. v. Schwartz,* 281 N.Y.S.2d 420, 426 (App.Div.2d Dept.1967) (holding that a valid liquidated damages clause requires both parties to be bound to a fixed amount). Such a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                      Page 5
Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626
(Cite as: Not Reported in F.Supp.)

result is inconsistent with basic principles of contract construction. *See Uniroyal, 562 N.Y.S.2d at 614*.

Accordingly, defendant's motion for summary judgment on the issue of liquidated damages is granted.

*The CUTPA Claim*

S & S has cross-moved for summary judgment dismissing Count Four of plaintiff's complaint, which alleges that defendant has violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42-110a (1992). Count Four of plaintiff's complaint alleges that S & S regularly contracts for the services of authors who reside and perform their services in Connecticut, that defendant has pursued a frequent practice of cancelling authors' contracts without good cause, and that such a practice constitutes an unfair business practice.

Assuming, *arguendo,* that the CUTPA even applies to the publisher-author relationship,[FN5] plaintiff has not produced anything other than the allegations in the complaint in opposition to defendant's motion for summary judgment on which a reasonable factfinder could find there was a violation of the CUTPA. Summary judgment is therefore appropriate on this ground alone.

However, summary judgment is warranted without even looking at the applicability of the CUTPA to publishing agreements because the parties agreed to be bound by New York law. Paragraph 33 of the Agreement provides, in relevant part, that "[t]his Agreement and its interpretation shall be governed by the substantive laws of the State of New York." Defendant's Exhibit 1, ¶ 33. Plaintiff argues that Connecticut law may still apply to prohibit defendant from engaging in unlawful conduct and causing injury to residents of the State of Connecticut. That is certainly true as a general proposition. However, in this case, plaintiff's claim clearly arises out of her own dealings with S & S, the relationship between plaintiff and S & S is explicitly governed by the Agreement and, therefore, the parties are bound by New York law.[FN6] Defendant's motion for summary judgment dismissing the CUTPA claim is therefore granted.

**\*7** In sum, plaintiff's motion for summary judgment is

denied. Defendant's cross-motion is granted in part; the Court finds that plaintiff is bound by the liquidated damages clause in ¶ 9(a) of the Agreement and the CUTPA claim is hereby dismissed.

SO ORDERED.

FN1. By letter agreement dated April 1, 1992, the parties subsequently extended this date to September 30, 1992. *See* Defendant's Exhibit 3.

FN2. S & S published Villella's memoirs, entitled *Prodigal Son,* in 1992.

FN3. The complaint also included a fraud claim, which was subsequently dropped pursuant to a stipulation by the parties.

FN4. The Court does note, however, that the deposition testimony of Regan and Grose which plaintiff offers in support of her reading of the Agreement has been grossly mischaracterized and taken out of context.

FN5. The CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42-110b(a). The CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn.Gen.Stat. § 42-110a(4). Connecticut courts have generally interpreted "trade or commerce" as involving a relationship between a commercial vendor and consumers, competitors or other businessmen. *See Quimby v. Kimberly Clark Corp., 613 A.2d 838, 844 (Conn.App.1992)* (consumers); *Cascia v. Cook Inlet Communications Co., 1993 WL 499099 (Conn.Super.Ct.1993)* (competitors); *Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 64 (1987).* It therefore seems unlikely that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.        Page 6
Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626
**(Cite as: Not Reported in F.Supp.)**

the activities of S & S, in contracting with authors to publish their work, falls within the intended scope of the statute.

FN6. Plaintiff has not produced a shred of evidence regarding defendant's conduct towards other Connecticut authors.

S.D.N.Y.,1994.

Gregory v. Simon & Schuster, Inc.

Not Reported in F.Supp., 1994 WL 381481 (S.D.N.Y.), 23 Media L. Rep. 1626

Briefs and Other Related Documents (Back to top)

• 1:93cv04674 (Docket) (Jul. 12, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 24, 2006, he caused the foregoing Brief to be

served by overnight delivery upon:

> Marc Kieselstein
> David R. Seligman
> Rebecca O. Fruchtman
> Kirkland & Ellis LLP
> 200 East Randolph Drive
> Chicago, Illinois 60601
> Telephone:     (312) 861-2000
> Facsimile:     (312) 861-2200

/s/ John J. Voorhees, Jr.

1355603.5