**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 06 C 4243 |
| | ) | |
| UAL CORPORATION, et al., | ) | Honorable John W. Darrah |
| | ) | |
| Reorganized Debtors. | ) | *Appeal from the United States* |
| | ) | *Bankruptcy Court for the Northern* |
| | ) | *District of Illinois, Eastern Division* |
| | ) | *Case No. 02-B-48191* |
| | ) | |
| | ) | *Hon. Eugene R. Wedoff* |
| | ) | |
| | ) | |
| | ) | |

**APPELLANT GENERAL FOODS CREDIT CORPORATION'S**

**REPLY AND RESPONSE TO CROSS-APPELLANT'S BRIEF**

David S. Curry (ARDC #6184327)
Robert A. Kelman (ARDC #1440470)
Jonathan D. Kron (ARDC #6190570)
John J. Voorhees, Jr. (ARDC #6209292)
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone:(312) 782-0600
Facsimile: (312) 701-7711

and

David Abbott (ARDC #3126754)
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019-5820
Telephone:(212) 506-2500
Facsimile: (212) 262-1910

*Attorneys for Appellant*

ORAL ARGUMENT REQUESTED October 12, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.     UNITED AGREED TO INDEMNIFY GFCC FOR SPECIFIED REDUCTIONS IN GFCC'S NET ECONOMIC RETURN ................................................................. 2

     A.    According To The Plain Language Of Section 5, United Agreed To Indemnify GFCC For Reductions In GFCC's Net Economic Return ..................... 2

     B.    United Distorts The Language Of The TIA ......................................................... 3

          1.    Net Economic Return has not been assigned ................................................ 4

          2.    GFCC is not claiming amounts paid or payable to other parties as SLV ......................................................................................................... 5

          3.    United's arguments are inconsistent with the TIA provisions that permit United to take GFCC's tax savings into account .............................. 6

          4.    United misstates the definition of Net Economic Return to consider yearly cash flows rather than aggregate cash flows ..................................... 9

II.    THE TIA REQUIRES UNITED TO "GROSS-UP" THE FULL, UNADJUSTED AMOUNT OF GFCC'S TAX INDEMNITY PAYMENT ............................................... 10

     A.    GFCC Has One Claim, Not Two ......................................................................... 11

     B.    The Language Of The TIA Is Inconsistent With United's Arguments.................. 12

     C.    United's Theory, If Adopted, Would Pose Difficult Evidentiary Issues ............... 15

     D.    Reduced Distributions In Bankruptcy Do Not Produce "Tax Savings" Resulting From The Foreclosure ......................................................................... 17

     E.    GFCC Is Entitled To The Same Pro Rata Distribution As Other Creditors .......... 18

CONCLUSION.................................................................................................................... 19

17404726.4

# TABLE OF CASES, STATUTES AND
# OTHER AUTHORITIES

## Cases

*In re 266 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) ................................... 18

*Analisa Salon, Ltd. v. Elide Properties, LLC*, 818 N.Y.S.2d 130 (N.Y. App. Div. 2006) ............... 2

*In re Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 791 F.2d 524, 532 (7th Cir. 1986). 13

*Deutsche Bank AG v. AMBAC Credit Prods., LLC*, 2006 WL 1867497 *10 (S.D.N.Y. 2006) ........ 7

*Dorato v. Blue Cross of Western New York, Inc.*, 163 F. Supp. 2d 203, 212 (W.D.N.Y. 2001) ....... 6

*Glimco v. Commissioner of Internal Revenue*, 397 F.2d 537, 540 (7th Cir. 1968) ........................... 6

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ........................................ 6

*In re Matco-Norca, Inc.*, 22 A.D.3d 495 (N.Y. App. Div. 2005) .................................................... 13

*In re O.P.M. Leasing Services, Inc.*, 56 B.R. 678, 684 (Bankr. S.D.N.Y. 1986) ........................... 13

*Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15, 20 (2000) ..................................................................... 12

*In re Sanford*, 979 F.2d 1511, 1513 (11th Cir 1992) ..................................................................... 12

*United States v. City of Chicago*, 978 F.2d 325, 330 (7th Cir. 1992) ............................................. 6

## Statutes

11 U.S.C. § 502(b)……………………………………………………………………………12

## Other Authorities

O'Rourke, Kerry, *Valuation Uncertainty in Chapter 11 Reorganizations*, 2005 Colum. Bus. L.
  Rev. 403 ................................................................................................................................. 17

## INTRODUCTION

The indemnity claims at issue in this case arise out of six aircraft leveraged leasing transactions.  General Foods Credit Corporation ("GFCC") invested in the aircraft (the "Aircraft") that were purchased and leased to United.  In exchange for its investment in each Aircraft, GFCC was to obtain certain tax benefits (*e.g.*, annual deductions for the depreciation of the Aircraft) as well as cash rent payments made by United under each lease (each, a "Lease") (in excess of rents payable to the lenders) and the Aircraft's expected residual value at the end of each Lease.  See GFCC Opening Brief ("GFCC Br.") at 5.  Because of United's default under the Leases and the lenders' foreclosures of the Aircraft that followed, GFCC lost ongoing tax benefits, will have to pay substantial unanticipated tax liabilities and lost the cash flows from rents and residuals.

As part of these transactions, United and GFCC entered into Tax Indemnity Agreements (collectively, the "TIA").  In the TIA, United promised GFCC that, if the tax benefits GFCC received from the transaction were diminished, United would compensate GFCC for the decrease in economic benefits GFCC would realize under the transaction.  The TIA refers to this economic benefit as GFCC's "Net Economic Return."  GFCC Br. at 7.  GFCC Appendix, Tab 3 (Group Exhibit A), TIA § 5(b).[1]  GFCC and United agreed that GFCC's Net Economic Return would include the aggregate after-tax cash flows originally assumed by GFCC in its pricing of the Lease.  See GFCC App., Tab 3 (Group Exhibit A), *Lease* §1.

Because of United's default and the ensuing foreclosure on the Aircraft, GFCC asserted a claim under the TIA for $94,999,522.76, the after-tax amount needed to compensate GFCC for the income taxes it had to pay following the foreclosure (the "TIA Claim").  United and GFCC dispute

---

[1]     All references to "GFCC App." are to the Appendix To GFCC's Statement of Issues On Appeal And Designation Of Items To Be Included In The Record On Appeal, which was filed with the Bankruptcy Court on July 21, 2006.

whether United should be permitted to offset the TIA Claim with GFCC's future tax savings when United has defaulted on payments that otherwise would be included in GFCC's Net Economic Return and out of which GFCC would have paid those future taxes. United and GFCC also dispute whether the After-Tax Basis[2] calculation of the indemnity payment should be based on the dollar amount of GFCC's indemnity claim or the dollar value of the distribution of stock that GFCC will receive pursuant to United's plan of reorganization.

## ARGUMENT

I.  **UNITED AGREED TO INDEMNIFY GFCC FOR SPECIFIED REDUCTIONS IN GFCC'S NET ECONOMIC RETURN.**

A.  **According To The Plain Language Of Section 5, United Agreed To Indemnify GFCC For Reductions In GFCC's Net Economic Return.**

The TIA is a stand-alone agreement between United and GFCC, and United's indemnity obligation to GFCC is governed by the TIA – not by the Lease, the Indenture, or any other operative document. In order to respond to United's various arguments, we first return to the language of Section 5 of the TIA ("Indemnity for Loss of Assumed Tax Benefits"). Section 5 has the following five subsections, which together delineate United's obligation: (a) defines the event that triggers United's indemnity obligation (*i.e.*, a "Loss"); (b) defines the amount United must pay to GFCC; (c) explains under what circumstances and to what extent GFCC must reimburse United for any Tax Savings; (d) defines the time of payment; and (e) provides an alternative form of indemnity payment. As with any contract, these sections must be read together to form a cohesive whole. *Analisa Salon, Ltd. v. Elide Properties, LLC*, 818 N.Y.S.2d 130 (N.Y. App. Div. 2006) (holding that in interpreting one provision of a contract, the agreement should be read as a whole so that the provisions are interpreted in the proper context).

---

[2]     All capitalized terms not otherwise defined in this brief shall have the meanings ascribed to them in the leases or GFCC's opening brief., as applicable. A representative copy of one set of operative documents, which includes a lease, is included in the appendix. *See* GFCC App., Tab 3 (Group Exhibit A).

Section 5(b) explicitly provides how United's lump sum indemnity payment amount must be calculated. *See* GFCC Br. at 6-8. The indemnity is "the lump sum amount which, on an After-Tax Basis, shall cause [GFCC's] Net Economic Return to be maintained after taking into account" additional taxes to be paid as well as reasonably anticipated Tax Savings. GFCC App., Tab 3 (Group Exhibit A), TIA § 5(b). Thus, United must "maintain" GFCC's Net Economic Return, while "taking into account" GFCC's tax losses and savings. "Taking into account" GFCC's tax losses and savings requires a comparison between the after-tax cash flows before the Loss (based on the original pricing of the transaction) and the after-tax cash flows after the Loss. This comparison permits the calculation of a lump sum payment which, when combined with the other post-Loss cash flows, will preserve Net Economic Return while taking into account the tax losses and savings. However, whether in any given circumstance the savings are added or subtracted in the calculation (in whole, in part or not at all), depends on the basic requirement to "maintain" Net Economic Return, which lies at the heart of the calculation and United's contractual obligation. *See* GFCC App., Tab 3 (Group Exhibit A), TIA § 5(b). One cannot, as United does, calculate an amount that maintains Net Economic Return, and then, as United proposes, require an offset from that amount, and arrive at an indemnity amount that still maintains Net Economic Return.

### B.     United Distorts The Language Of The TIA.

The Bankruptcy Court incorrectly reduced GFCC's TIA Claim by granting United an automatic offset for so-called Tax Savings against the amount owing under the TIA, even though the offset in question was inconsistent with the requirement to maintain Net Economic Return. The TIA requires Net Economic Return to be "maintained" and permits Tax Savings to be "taken into account" only to accomplish that result. "Taking into account" does not mean "automatically subtract." Rather, "taking into account" means that the parties must consider both the tax gains and losses that flow from the Loss and then take them into account as necessary in order to arrive

at a lump-sum amount that will maintain GFCC's Net Economic Return.  And in order to

"maintain" GFCC's Net Economic Return, there can be no offset for future income taxes that

GFCC avoided when those taxes would have been paid from rental income GFCC will not receive.

The Bankruptcy Court violated the terms of the TIA and committed legal error when it allowed

United to take such an offset in the face of its default.

        **1.**        **Net Economic Return has not been assigned.**

United makes several arguments on Net Economic Return, but none of them is based on

any provision of the TIA – the agreement at issue in this case.  Instead, United attempts to confuse

the issues and misdirect the appropriate analysis away from the language of the TIA.  United

contends that Net Economic Return *in the TIA* is the same as the equity portion of Stipulated Loss

Value ("SLV") *in the Lease*; United then contends that, because the Owner Trustee has pledged

SLV to the lenders as security, GFCC's Net Economic Return has been assigned as well.  *See*

United Br. at 6, 11-12, 16-21 and 25.  Net Economic Return and SLV are not the same thing.  By

mixing apples and oranges, United creates the illusion that GFCC has been "divested" of its Net

Economic Return, including its express right to the protection of its Net Economic Return under

the TIA.   It is undisputed, however, that Net Economic Return **has not been assigned**, and

therefore it remains protected by the TIA.

The TIA specifically mandates that Net Economic Return be "maintained" if GFCC has

certain unanticipated tax liabilities.  Discussing how Net Economic Return might be impacted,

considered or used in *other* contexts involving *other* agreements – for instance, in any given

calculation of SLV in the Lease – is irrelevant.  United is obligated under the TIA to "maintain"

GFCC's Net Economic Return to the fullest extent with respect to GFCC's tax liabilities.

### 2.    GFCC is not claiming amounts paid or payable to other parties as SLV.

In confusing Net Economic Return with SLV, United raises the specter of a possible double payment because of its obligation to maintain GFCC's Net Economic Return under the TIA and its obligation to pay SLV to the lenders under the Leases.  Regardless of whether any such "double payment" is an issue given United's clear obligation to pay both Net Economic Return and SLV under separate agreements to different parties, United concedes that no such double payment potential exists.  *See* United Br. at 8.  United admits that, in satisfying the lenders' deficiency claims, it agreed to pay the lenders an amount "reflecting the shortfall between the aircraft collateral value and debt balance outstanding."  *Id.*  The "debt balance outstanding" does not contain any portion of the equity cash flows under SLV that comprise GFCC's Net Economic Return.  United also explicitly acknowledges that GFCC's TIA Claim "was not one of the duplicate SLV claims because GFCC'S TIA Claim was specifically carved out of SLV and expressly reserved and preserved pursuant to the Debt Settlement."  *Id.*  In other words, in the case of the GFCC lease transactions, none of United's settlements with the lenders include any amount in excess of the debt balance.  That means that none of those settlements involved GFCC's Net Economic Return.  As a result, it is uncontested that no possibility of double payment exists with regard to GFCC's TIA Claim for Net Economic Return.

It is a mystery as to why United believes that there is any risk of a potential double payment in light of its concessions.  However, there is no mystery as to why United continues to urge that the lenders have SLV claims and that SLV has been assigned (or, as United often puts it incorrectly, Net Economic Return has been assigned).  Given that *United has not paid any of the equity portion of SLV* – as originally computed including equity cash flows – to the lenders or any other party, far from trying to avoid a duplicate payment, United is trying to use its claim of offset to avoid paying nearly all of the tax losses to anyone (whether in Net Economic Return under the

TIA or in SLV). United is not trying to avoid double payment of a claim it is seeking to shirk responsibility to pay the claim even once.[3]

> **3.** **United's arguments are inconsistent with the TIA provisions that permit United to take GFCC's tax savings into account.**

United asserts that GFCC ignored the provisions of Section 5(b) referring to Tax Savings. United Br. at 15. This is not true. Far from ignoring the Tax Savings language contained in Sections 5(b) and (c) of the TIA, GFCC discussed and put this language in its proper context: it is part of, not an exception to, United's obligation to maintain GFCC's Net Economic Return. GFCC Br. at 9, 13-15. United offers no response to GFCC's arguments on those points.

United reluctantly admits that its own default impacts the calculation and payment of Tax Savings under certain TIA provisions. *See* United Br. at 23. However, United attempts to distinguish those provisions as somehow reflecting a different agreement, with different purposes and different results. This is an unwarranted and tortured reading of the TIA.

TIA Section 5 contains several subparagraphs, all of which relate to the payment of indemnities under the TIA. Standard principles of contract construction require that they be read in a consistent and comprehensive manner. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("[A] document should be read to give effect to all its provisions and to render them consistent with each other.") (applying New York law). None of these subparagraphs is an exception to the others, and even United has not asserted that they are. Section 5(b) contains the general mandate to provide a lump sum indemnity by "taking into account" liabilities and savings

---

[3]    United's references to other settled claims under tax indemnity agreements with other parties are inappropriate. *See* United Br. at 10-11. Aside from the principle that no inference can be drawn from settlements by other litigants (*see Glimco v. Commissioner of Internal Revenue*, 397 F.2d 537, 540 (7th Cir. 1968) (court considering settlement "irrelevant and immaterial and as creating no estoppel"); *United States v. City of Chicago*, 978 F.2d 325, 330 (7th Cir. 1992) (settlements are not binding on third parties); *Dorato v. Blue Cross of Western New York, Inc.*, 163 F. Supp. 2d 203, 212 (W.D.N.Y. 2001) (settlement agreements do not have collateral estoppel effect), there is a crucial difference between those other agreements and GFCC's TIA Claim: United has expressly conceded that there is no double count issue with regard to GFCC. United Br. at 8. As a result, all of the other agreements and their settlements are irrelevant.

in a manner that "maintain[s] Net Economic Return." This prevents a subtraction, netting, or offset for Tax Savings when that would prevent the maintenance of Net Economic Return. Section 5(c), which United tries to make disappear altogether, provides for subsequent Tax Savings to be paid to United only if (1) they are not already accounted for under Section 5(b) and, more importantly, (2) United is not in default.

Subparagraphs (b) and (c) of Section 5 can, and must, be read consistently. The requirement that Tax Savings be subtracted (or paid back) – *but only if United is not in default* – is integral to Section 5's overarching mandate to maintain GFCC's Net Economic Return. Under United's theory, that the existence of a United default is to be ignored in calculating its lump sum indemnity obligation under Section 5(b), one would not expect to find a default condition on GFCC's payment of tax savings under Section 5(c). However, because the no-default condition is in fact contained in Section 5(c), United's interpretation of Section 5(b) violates the basic principle of contract construction that an agreement must be read to give all of its provisions meaning. United's position must therefore be rejected. *Deutsche Bank AG v. AMBAC Credit Prods., LLC*, 2006 WL 1867497 *10 (S.D.N.Y. 2006) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.").[4]

The principle underlying Section 5(c) is a straightforward commercial one – GFCC is not required to pay money to United while United has overdue, unpaid obligations to GFCC. If United's reading of Section 5(b) were correct, it would never have accepted Section 5(c) as written since, under Section 5(c), United's default prevents it from receiving a payment from GFCC of Tax Savings. Default or no default, an agreement consistent with United's interpretation would require all tax savings to be paid to United. But this is not what the document actually provides.

---

[4]     The *Deutsche Bank AG* decision is attached as an Appendix to the GFCC Opening Brief.

Since Section 5(c) prevents payments of tax savings in default cases, the only consistent reading of Section 5 is that the Net Economic Return requirement of Section 5(b), like Section 5(c), cannot permit an offset for tax savings after United is in default.

United's reasons for distinguishing Section 5(c) are utterly insufficient. First, United attempts to set Section 5(c) aside by arguing that Sections 5(b) and (c) are entirely disconnected. United Br. at 23-25. United's argument is based on its assertion that the netting exercise in calculating the lump sum payment under Section 5(b) is entirely divorced from the need to "adjust that lump sum payout years later after the fact" under Section 5(c). United Br. at 23-24 (referring to this timing difference as the "key distinction" between Sections 5(b) and (c)). It seems, according to United, that (A) the initial determination of a lump sum amount payable and then (B) the later *adjustment* of that lump sum amount payable are entirely separate exercises, irrelevant to each other. United interprets the adjustment provision so that it results in a calculation inconsistent with the original calculation being adjusted. This is not contract interpretation but obfuscation. Sections 5(b) and (c) must be read as a consistent package designed to calculate payments that "maintain" Net Economic Return. Each must take Tax Savings into account but neither can adjust the indemnity calculation for Tax Savings if Net Economic Return will not be "maintained" due to a United default.

That subparagraphs (b) and (c) must be read together also can be seen in the cross-references in the TIA. Section 5(b) uses the defined term "Tax Savings," which in turn is defined in the TIA by a specific reference to Section 5(c), as United itself acknowledges. United Br. at 14 n.6.

United also argues that there is a difference between providing an offset against the TIA Claim (Section 5(b)) and providing a payment back to United (Section 5(c)) and that this

difference can and should result in different interpretations of each clause. United Br. at 23-24. United offers no authority for this distinction, and there is no logical reason for distinguishing an offset on behalf of United and a payment back to United.

United finally claims to find support for its purported offset claim in quotes of William Macan in a text on leasing. United Br. at 14. But, first, the quotation in question itself requires that the indemnity payment "keep the owner participant whole," a condition certainly not being satisfied here, and, second, does not in any way address the present situation, where a lessee is in default and nevertheless is claiming an offset against a tax indemnity clearly arising from that default. Accordingly, that passage offers no help in interpreting GFCC's TIA under the facts presented here.

<b>4. United misstates the definition of Net Economic Return to consider<br>yearly cash flows rather than aggregate cash flows.</b>

The definition of Net Economic Return requires maintenance of "*aggregate*" after-tax cash flows. *See* GFCC App., Tab 3 (Group Exhibit A), TIA § 1. There is a crucial difference between a Net Economic Return definition that maintains annual or periodic cash flows and one that maintains aggregate cash flows over the lease term. United mischaracterizes the Net Economic Return definition in the TIA by looking at *yearly or annual* results instead of aggregate results over the lease term. United Br. at 20-22. By setting up a straw man in the guise of a purported requirement to look to annual cash flows and then knocking it down by declaring that "contrary to GFCC's assertions, there is certainly no annual correlation between available cash flows and taxes" (*Id.* at 21), United misleads the Court both as to GFCC's position and the definition of Net Economic Return. GFCC has made no assertion as to annual cash flows, and the definition of Net Economic Return does not consider annual cash flows.

The definition of Net Economic Return is tied explicitly to "aggregate" cash flows. In the aggregate, GFCC expected to be able to pay all of the taxes to which United points as Tax Savings entirely from the cash flows generated from within the transaction (*i.e.*, United's rent payments) over the course of the Lease. This can be seen by making a comparison, during the aggregate period from the declaration of bankruptcy to the scheduled end of each lease, of (a) the aggregate tax liabilities to be paid ($94.7 million) with (b) the aggregate cash flows from the equity portion of rents to be received ($95.2 million). GFCC App., Tab 6, Exhibit A. United's misleading insertion of the "annual" or "yearly" concept distorts the plain language of the TIA.

Those future cash flows are no longer available because of United's default. As a result, GFCC's Net Economic Return cannot be maintained and will be further eroded if the Tax Savings are automatically deducted from GFCC's TIA Claim without taking into account the fact that those future taxes would have been paid out of future cash flows. United would, in effect, require GFCC to bear the burden of future taxes while at the same time deprive it of the funds from which those taxes would have been paid, requiring GFCC to make a new investment in a failed deal. This unquestionably reduces GFCC's Net Economic Return in violation of the TIA.

## II.  THE TIA REQUIRES UNITED TO "GROSS-UP" THE FULL, UNADJUSTED AMOUNT OF GFCC'S TAX INDEMNITY PAYMENT.

The Bankruptcy Court correctly applied "black letter" law to determine the so-called "Gross-Up Issue," upholding a portion of GFCC's claim. The Bankruptcy Court held that a claim is calculated "as of the date of the bankruptcy filing pursuant to §§ 365(a) and 502(b) of the [Bankruptcy] Code, and in a manner that is consistent with the remedies that would be afforded it under New York law." GFCC App., Tab 15 at 10. The Bankruptcy Court went on to observe that "it is axiomatic that a claim calculated immediately prior to the petition cannot take into effect the bankruptcy itself or the amount that a creditor is entitled to receive." *Id*. at 11. In other words, the

claim is subject to reduction only once – not once when the amount of the claim is determined and then again when it is paid. United is, as the Bankruptcy Court pointed out, "attempting to modify the [pre-petition] claim based on post petition events" to the detriment of GFCC. *Id*. at 11.

One need go no further than this obvious and common sense recitation of law. However, in response to arguments advanced by United in its brief, it may be useful for the Court to understand the context of this so-called "gross-up" dispute.

A.     **GFCC Has One Claim, Not Two.**

United contends that the TIA Claim should be bifurcated into two claims: one for a "base" amount and a second for a "gross-up" amount. United Br. at 27. That is not correct. The TIA calls for an indemnity payment to be made on an "After-Tax Basis." This term is defined in the TIA as providing:

> "*an amount* which, after the deduction of all Federal state, local and foreign taxes required to be paid by or on behalf of the Owner Participant in respect of the receipt or realization of such amount, is equal to the payment required to be made to the Owner Participant under any provision of this Agreement."

GFCC App., Tab 3 (Group Exhibit A), TIA § 1(a). (emphasis added).

As the definition makes clear, GFCC has one unified claim for a single "amount" calculated to maintain GFCC's aggregate after-tax cash flow. The gross-up concept is merely one element of the general requirement to make a "gross" payment that will leave GFCC with a specified level of cash flows, which are to be calculated on an after-tax basis. To illustrate, if an employee needed $1,000 per week to pay for groceries, rent and utilities, he or she would require a weekly salary substantially more than $1,000 so that he or she would have the money to pay for those necessities after taxes are deducted and paid. If the employer failed to pay the agreed-upon "grossed-up" salary, the employee would have a claim for the full amount of the promised wages. That claim would be a single amount based on the total salary earned. The claim would not be for

a base amount of $1,000, and another claim for the taxes or gross-up (subject to reductions under United's theory).

GFCC's claim is conceptually the same as this simple illustration. Under the TIA, GFCC bargained for – and United agreed to pay – a single grossed-up amount. Thus, for example, if GFCC were to suffer an indemnifiable tax loss of $100, United agreed in the TIA to make a payment to GFCC in a grossed-up amount, which would take into account the taxes that would be payable on that amount. That amount is calculated in the TIA as the $100, plus the taxes that would be payable on that total amount. *See* GFCC App., Tab 3 (Group Exhibit A), TIA § 5(b).

There is a well-recognized, simple formula for calculating the indemnity payment required by the TIA: $100 divided by one minus the tax rate. If the tax rate is 35 percent, or .35, then the specified loss of $100 is divided by .65 (the result of 1-.35) which produces a gross indemnity amount of $153.85.[5]

In this example, GFCC does not have one claim for $100 plus a second claim for $53.85. Rather, the claim under the TIA is for $153.85. That is the single amount required by the language of the TIA. United's attempt to artificially and needlessly bifurcate the TIA Claim into two elements has no basis in the TIA.

## B. The Language Of The TIA Is Inconsistent With United's Arguments.

As the Bankruptcy Court properly recognized, Section 502(b) of the Bankruptcy Code requires that the amount of GFCC's claim be determined just as it would be if GFCC were suing to enforce the TIA outside of bankruptcy under state law. *See Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15, 20 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation"); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir

---

[5]     By contrast, United's algebraically contorted formula – which is nowhere to be found in the TIA or any authority they cite – is anything but simple. It is (($100 x distribution %) ÷ (1 – tax rate)) – ($100 x distribution %) + $100.

1992) (holding that the amount of the IRS's tax penalty claims must be determined by applicable non-bankruptcy law, and reversing the bankruptcy court's reduction of those otherwise valid claims based on equitable considerations); *In re Chicago, Milwaukee, St. Paul and Pacific R.R.,* 791 F.2d 524, 532 (7th Cir. 1986) ("Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law."); *In re O.P.M. Leasing Services, Inc.*, 56 B.R. 678, 684 (Bankr. S.D.N.Y. 1986) ("Damages in a bankruptcy case must be measured in accordance with accepted contract law principles.").

The TIA is governed by New York law, and the law of that state requires that courts give effect to the parties' agreement as expressed in the language of their contract. *In re Matco-Norca, Inc.*, 22 A.D.3d 495 (N.Y. App. Div. 2005) ("It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations."). Consistent with this controlling legal principle, the Bankruptcy Court correctly ruled that GFCC is entitled to the full gross-up of its claim, irrespective of the amount of the distribution GFCC will receive in the bankruptcy. The language of the TIA allows for no other conclusion.[6]

---

[6]  United also suggests that the receipt of amounts under the TIA may not be taxable to GFCC. United Br. at 28. That suggestion is improper and impermissible because United expressly conceded the issue before the Bankruptcy Court. After the Bankruptcy Court asked United whether it was asking the Court to decide the "taxability" issue, Ms. Fruchtman, on behalf of United, stated "we are willing to go forward on the assumption that, yes, the gross-up is taxable." [Transcript of March 17, 2006, p. 91.] The Bankruptcy Court responded, stating: "That's not an issue that I will address." *Id.* Given United's concession that "the gross-up is taxable," United cannot now ask this Court to consider on appeal the "taxability" issue. *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 528-29 (7th Cir. 2000) (party waived ability to raise argument on appeal where it had "implicitly argued the opposite to the district judge"); *Gibson v. West*, 201 F.3d 990, 992 (7th Cir. 2000) (party waived argument by arguing opposite premise in prior briefs filed before Court of Appeals). Moreover, none of the cases cited by United deal with a situation where the income item in question was expressly denominated as "rent" in the relevant documents. See the Lease, Section 1, Definition of "Supplemental Rent." Treas. Reg. §1.61-8 quite clearly includes rent as income to the recipient. Treas. Reg. §1.61-8(c) specifically looks to the terms of the agreement to ascertain the intent to treat an item as rent. In the case of the United lease transactions, this intention was made clear by the express inclusion of indemnity payments within the defined term "rent."

The term "After-Tax Basis" is defined in the TIA as an amount that is to be calculated based on a "payment *required* to be made to [GFCC] under any provision of this Agreement." GFCC App., Tab 3 (Group Exhibit A), TIA § 1 (emphasis added).  As this language makes clear, the gross-up is to be calculated solely by reference to the amount that United is "required" to pay pursuant to the terms of the TIA.

The question then is: What exactly is the amount that United is "required" to pay under the TIA?  That question is answered in Section 5(b) of the TIA, which sets forth the amount of the indemnity payment that United is required to make to GFCC.  In fact, so that there is no mistake as to the parties' intent that the payment must be grossed-up based on what the agreement requires to be paid, the TIA even defines the payment that United is *required* to make under the TIA as the "Before-Tax Amount."  *See* GFCC App., Tab 3 (Group Exhibit A), TIA § 5(b) (defining that term as the taxes and related amounts incurred by GFCC as a result of an indemnified loss).

Returning to our simple example, the amount that United is "required" to pay – and therefore the amount on which the gross-up is based – is $100.  That is the indemnifiable tax loss or, in the words of the TIA, the "Before Tax Amount."  That amount must then be grossed-up, leading to a claim amount of $153.85.

Nothing in the TIA even remotely suggests, as United argues, that the gross-up calculation should be based on the amount that United actually pays, after breach of its obligations to GFCC under the TIA.  United asks the Court to ignore the language of the TIA and rewrite the contract so that instead of having the gross-up calculated based on the amount United is "required" to pay under the TIA, as the parties agreed, United's gross-up obligation would be based on the dramatically reduced amount that United will in fact pay as a result of its bankruptcy.  But the amount that United is going to pay is not even close to the amount United is "required" to pay by

14

the terms of the TIA.  In fact, by United's own admission, the amount United will pay has a value of somewhere in the range of 5 to 15 percent of what is required.

No legal principle permits such a wholesale rewriting of the TIA.  Plainly, the After-Tax Basis cornerstone phrase "payment required to be made … under … this Agreement" cannot be ignored, and it cannot be rewritten to mean the fractional amount that United pays as part of its bankruptcy.  United is not entitled to reduce GFCC's TIA Claim by the bankruptcy distribution percentage twice.[7]

### C. United's Theory, If Adopted, Would Pose Difficult Evidentiary Issues.

Even if this double reduction were in some way appropriate (and it clearly is not), it would raise difficult and perhaps insurmountable evidentiary issues, which United simply ignores.  Under United's theory, the separately determined gross-up claim would be reduced to 5.5 percent of what is required under the TIA (a 94.5 percent reduction).  That drastic reduction would result from the deemed value of the estimated distribution percentage of the stock paid out on claims upheld against United in the bankruptcy.  GFCC App., Tab 7 at 7.  GFCC's claim, having already been reduced by 94.5 percent, would then be subject to a second 94.5 percent reduction when the distribution actually is made.

In order to determine the amount of the claim under United's approach, the value of the consideration used to pay the claim must be determined.  United itself cannot decide what the correct value is.  The 5.5 percent value used in United's Objection was a figure based on United's Disclosure Statement.  But 5.5 percent was never an absolute valuation of the consideration to be

---

[7]     United cites Section 5(d) of the TIA for the proposition that it limits the indemnity to "what taxes actually have to be paid."  United Br. at 30.  Section 5(d) does no such thing.  It is not a calculation section; rather, its sole purpose is to determine <u>when</u> the indemnity payment must be made.  Once GFCC has described the Operative Event giving rise to the Loss and described the computation of the amount payable "pursuant to Section 5(b)," United must pay the indemnity computed pursuant to Section 5(b) no earlier than (A) GFCC's filing of a return <u>reflecting the loss</u> and (B) certain other events not relevant for these purposes.  Of course, Section 5(d) is not pertinent here, because bankruptcy accelerates United's indemnity obligations.  The Loss is defined in, and calculated pursuant to, Section 5(b), not Section 5(d).

received. It was merely an estimate. All unsecured creditors received a proportional distribution of the same common stock, whatever its actual value, for their claims.

However, in the context of United's novel gross-up theory, the absolute value of the stock must be known in order to determine the proper gross-up. This is a factual question that United simply has tried to assume away. United now suggests that the valuation might be anywhere from 5–9 percent of the claim amounts. *See* United Br. at 10.

The logistical and evidentiary implications of United's cart-before-the-horse assertion are breathtaking. It is quite possible that in the three-year history of the United bankruptcy, many claims could be and were adjudicated or settled years before the actual 5.5 percent distribution of common stock was finalized. United's theory would require that in any such claim involving a gross-up or similar concept (which could have been determined at the beginning of the three-year period rather than at the end of it), the dollar amount of the claim would have to be settled in an amount that necessarily depends upon speculative valuations of shares to be issued years later under a plan of reorganization that was not even approved when the claim was determined.[8] In fact, the speculation and uncertainty would continue long after the actual distribution date since the IRS would be free to challenge any valuation of the United common shares received, thereby resulting in tax disputes for many years after the distribution is final. Stock or business valuations are always complex factual questions and in the context of a bankruptcy can be especially difficult

---

[8]     If the Court were to adopt United's theory, one could argue in other cases that any claim resulting in taxable income to the recipient also is subject to United's theory, including claims for pre-bankruptcy interest, rents or compensation for services. It does not stretch the imagination to assume that the parties that negotiated rates for those items were aware that they would incur tax liabilities and that those taxes were then factored into the original rate calculation by the parties.

        For instance, it is well recognized that interest rates payable on taxable and tax-exempt bonds differ markedly. This reflects the common sense notion that interest on taxable bonds has an element of compensation for the tax liabilities incurred on that interest. In effect, this results in a "grossed-up" interest charge that leaves a net amount equal to the non-taxable interest. Under United's novel theory, all such claims for past due taxable interest could be artificially bifurcated into base and gross-up amounts, as United is attempting to do with GFCC, and then the gross-up portion would be subject to reduction in bankruptcy twice.

and subject to substantial uncertainties. Kerry O'Rourke, *Valuation Uncertainty in Chapter 11 Reorganizations*, 2005 Colum. Bus. L. Rev. 403.

United's calculation would burden the determination of the *claim* amount with these inherent uncertainties, which will survive even beyond the payment date. That is the end result of predicating a conclusion upon the conclusion itself. United's unusual theory would force the Court to conclude that for every valuation of the shares receivable for claims, there will be a unique resulting gross-up and thus a different dollar amount of the TIA Claim itself, a patently absurd result.

**D. Reduced Distributions In Bankruptcy Do Not Produce "Tax Savings" Resulting From The Foreclosure.**

United also argues that any reduction to taxable income by reason of the actual reduced distribution in its bankruptcy results in a Tax Savings that must be netted against the TIA Claim under Section 5(b). United Br. at 13-15. This last-ditch argument is contrary to the language of the TIA. The definition of "Tax Savings" in the TIA requires that the savings result from the "Loss." The Loss in this case is the foreclosure of the Aircraft along with the consequent tax liabilities resulting therefrom. The "Tax Savings" United now proposes as an offset relate to and arise from the later distribution of a TIA Claim under the plan of reorganization (which is a separate event from the foreclosure). The foreclosure was independent from the specific reduced payout contained in the plan of reorganization approved in 2006. The reduced distribution did not result from the Loss itself (which was the earlier foreclosure event), and foreclosure could occur without the plan of reorganization.

Further, even assuming such a reduced distribution could be considered a Tax Savings under the TIA, it arises after the event giving rise to the Loss and the calculation of the lump-sum claim under the TIA. As such, it is payable, if at all, under Section 5(c). Therefore, this amount

would be subject to the express limitations of Section 5(c). Even United has agreed that Section 5(c) prevents subsequent Tax Savings from being taken into account and paid when United is in default. *See* United Br. at 24.

### E. GFCC Is Entitled To The Same Pro Rata Distribution As Other Creditors.

It is fundamental that the determination of the dollar amount of GFCC's claim cannot and should not vary with the dollar value of the consideration GFCC receives for that claim in United's Bankruptcy. United's improper methodology violates this principle, and the Bankruptcy Court correctly refused to adopt it. The TIA Claim, properly computed under state law and the contract, must receive the same distribution as all other unsecured creditors. As such, it is subject to reduction due to United's inability to pay its claims in full – but like all other unsecured creditors, it should be subject to that reduction only once. GFCC's claim, once determined in accordance with state law, is entitled to the same *pro rata distributions* as all other unsecured creditors in the United bankruptcy. *In re 266 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) (unsecured creditors are "claimants of equal legal rank entitled to share pro rata.").

United's alternative calculation of the gross-up must be rejected and the Bankruptcy Court's decision on this issue upheld.

## CONCLUSION

For the foregoing reasons, GFCC requests that the Court reverse the Bankruptcy Court's

Order reducing GFCC's TIA Claim, affirm the Bankruptcy Court's ruling on the gross-up issue,

and remand this matter to the Bankruptcy Court for entry of an appropriate order.

October 12, 2006                                          Respectfully Submitted:


                                                         By:/s/ John J. Voorhees, Jr.

                                                         David S. Curry (ARDC #6184327)
                                                         Robert A. Kelman (ARDC #1440470)
                                                         Jonathan D. Kron (ARDC #6190570)
                                                         John J. Voorhees, Jr. (ARDC #6209292)
                                                         Mayer, Brown, Rowe & Maw LLP
                                                         71 South Wacker Drive
                                                         Chicago, Illinois 60606
                                                         Telephone:(312) 782-0600
                                                         Facsimile: (312) 701-7711

                                                         and

                                                         David Abbott (ARDC #3126754)
                                                         Mayer, Brown, Rowe & Maw LLP
                                                         1675 Broadway
                                                         New York, New York 10019-5820
                                                         Telephone:(212) 506-2500
                                                         Facsimile: (212) 262-1910

                                                         *Attorneys for Appellant*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 12, 2006, he caused the foregoing Brief to be

served by overnight delivery upon:

Marc Kieselstein
David R. Seligman
Rebecca O. Fruchtman
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:     (312) 861-2000
Facsimile:     (312) 861-2200

/s/ John J. Voorhees, Jr.