# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| UAL CORPORATION, et al., ) | |
| ) | |
| Reorganized Debtors. ) | |
| ) | |
| ———————————————— ) | |
| ) | |
| GENERAL FOODS CREDIT ) | Case No. 06 C 4243 |
| CORPORATION, ) | |
| ) | Honorable John W. Darrah |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED AIR LINES, INC., et al., ) | |
| ) | |
| Appellees/Cross-Appellants. ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the appeal of the Bankruptcy Court's July 7, 2006 Order. For the reasons that follow, the July 7, 2006 Order of the Bankruptcy Court is affirmed in part and reversed in part.

## BACKGROUND

In 1992, United Air Lines, Inc. entered into leveraged lease transactions to finance the acquisition of six aircraft, Tail Nos. N567UA through N572UA. In each of the transactions, United purchased the aircraft from a manufacturer and contemporaneously sold all of its interests to an "owner trustee." Concurrent with the sale of the aircraft to the owner trustee, the owner trustee leased the aircraft back to United pursuant to a lease agreement.

General Foods Credit Corporation, as "owner participant," provided equity financing for each purchase. The financing provided by General Foods represented only a portion of the cost of the aircraft. To finance the balance of the investment, the owner trustee – which holds title for the benefit of the owner participant – issued non-recourse equipment notes through a trust indenture and mortgage. The indenture trustee, acting on behalf of the noteholders, obtained a security interest in the owner trustee's rights both in each aircraft and under each lease with United.

As part of the transactions, General Foods anticipated receiving a defined return – primarily based on cash flow from the leases (net of the amount needed to service the equipment notes) and from the tax consequences arising from the structure of the transaction (amortization of the aircraft and interest deductions from note payments). In order to protect against tax consequences that were not anticipated, United and General Foods entered into Tax Indemnity Agreements ("TIA"), one for each of the financed aircraft, which sets forth the terms under which United is required to indemnify General Foods against tax consequences that differ from the ones factored into the pricing of the lease.[1] The TIA states that the parties "intend to set forth their agreement with respect to the circumstances under which the Lessee shall be required to indemnify the Owner Participant for the loss of certain . . . tax benefits . . . ."

Section 5 of the TIA sets forth the manner in which a claim under the TIA was to be calculated. This section provided, in pertinent part:

> (b) <u>Indemnity</u>. The amount payable by reason of any Loss shall be a lump sum amount which, on an After-Tax Basis, shall cause the

---

[1] While different operative documents were entered into for the six aircraft, the documents are substantially similar; and the parties presented their arguments based on the operative documents for Tail No. N569UA. The Court's analysis, using the same operative documents, applies to all six transactions.

2

Owner Participant's Net Economic Return to be maintained after taking into account the sum of the following amounts payable by the Owner Participant with respect to such Loss: (A) the additional Federal and State income tax payable as a result of such Loss, and (B) any interest, additions to tax or penalties associated with such Federal income tax . . . (the sum of (A) and (B) referred to as the "Before-Tax Amount").

The calculation of such lump sum amount shall: . . . (C) take into account any Tax Savings reasonably expected to be available to the Owner Participant as a result of the Loss or Losses expected . . . .

(c) Tax Savings. If, as a result of a Loss for which indemnification is paid by the Lessee hereunder, the Owner Participant shall recognize any Tax Savings not taken into account under Section 5(b) above in determining the amount payable to the Owner Participant under Section 5(b), then, provided no Default or Event of Default shall have occurred and be continuing, the Owner Participant shall pay to the Lessee an amount equal to the sum of such Tax Savings realized by the Owner Participant plus the amount of any Tax Savings Gross-Up. . . .

"After-Tax Basis" is defined in the TIA, in relevant part, as "an amount which, after the deduction of all Federal, state, local and foreign taxes required to be paid by or on behalf of the Owner Participant in respect of the receipt or realization of such amount, is equal to the payment required to be made to the Owner Participant under any provision of this Agreement . . . ." "Tax Savings" is defined in the TIA as "the amount of Federal and State income tax savings, calculated as provided in Section 5(c), which the Owner Participant recognizes as a result of a Loss (as defined in Section 5(a)) for which Lessee is required to indemnify the Owner Participant." "Tax Savings Gross-Up" is defined in the TIA as "the amount of Federal, state, local and foreign income tax

3

savings, calculated as provided in Section 5(c), which the Owner Participant recognizes as a result of any payment made to the Lessee by the Owner Participant (including a payment in respect of a Tax Savings Gross-Up)."

"Net Economic Return" is defined, in relevant part, in the lease as:

> the Owner Participant's net after-tax book yield, aggregate after-tax cash flow and no less than 100% of book income for each year prior to the fifth anniversary of the Closing Date, and book income shall not be increased or decreased by more than 10% for each subsequent year of the Lease Term, utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions as were utilized by the Owner Participant in determining Basic Rent, Excess Amount, Stipulated Loss Value percentages . . . .

Section 8 of the TIA provides:

> Section 8. <u>Adjustment of Stipulated Loss Value and Termination Value</u>. If any amount is required to be paid hereunder by the Lessee with respect to a Loss and is actually so paid, the Owner Participant shall cause the Lessor to recompute Stipulated Loss Value and Termination Value percentages with respect to the Aircraft to reflect such Loss in accordance with the manner in which such values were originally computed, or adjusted pursuant to Section 3 of the Lease, by the Owner Participant, . . . . In no event shall Stipulated Loss Value or Termination Value as recomputed for any period be less than the principal amount, premium, if any, and accrued interest on the Loan Certificates. Any recomputation under this Section 8 shall not take into account any Tax Law Changes.

"Stipulated Loss Value" is defined in the lease, in relevant part, as:

> with respect to the Aircraft as of any date through and including the last day of the Basic Term, means the amount determined by multiplying Lessor's Cost for the Aircraft by the percentage specified in Exhibit C hereto opposite the Stipulated Loss Value Date with respect to which the amount of Stipulated Loss Value is determined (as such Exhibit C may be adjusted from time to time as provided in Section 3(c) hereof and in Section 8 of the Tax Indemnity Agreement).

4

On December 9, 2002, United filed a voluntary petition under Chapter 11 of Title 11, United States Code. At the same time, United ceased making rental payments under the leases. United's failure to pay the rents resulted in a default under the mortgages, repossession of the aircraft by the indenture trustee, and the assertion of secured claims against United. As a result of a settlement between United and the indenture trustee, the six aircraft have been sold; and General Foods will be taxed on the gain recognized at the time of the sale.

General Foods filed a claim against United under the TIAs for the additional tax liabilities that it will incur as a result of the indenture trustee's foreclosure and sale of the aircraft. General Foods' amended claim sought approximately $95 million under the TIAs and an expense claim for the balance. The parties agreed on the treatment of the expense claim, leaving the TIA claims at issue.

General Foods' taxable gain occasioned by the foreclosures resulting from United's defaults was calculated in accordance with the provisions of the TIAs. This taxable gain and the resulting tax liabilities constitute cash outflows that were not anticipated or assumed in the initial calculation of Net Economic Return. The gain at the foreclosure sales equaled the balance of the outstanding notes less any remaining tax basis in the aircraft. The taxable gain realized by General Foods upon the foreclosures was multiplied by the tax rate specified in the TIAs. The parties do not dispute the amount of General Foods' taxable gain or the calculation of tax thereon due to the foreclosure sales.

However, United objected to the amount of General Foods' TIA claims, arguing that the TIA claims should be reduced by the tax savings General Foods would realize as a result of not receiving lease payments from United and that the "gross-up" adjustment to the claim, which compensates General Foods for taxes that would be incurred on any payment that it receives pursuant to the TIAs,

must be calculated based on the diminished payments that General Foods will actually receive on its TIA claims under United's Chapter 11 plan.

On July 7, 2006, the Bankruptcy Court issued an Order, ruling that: (1) the TIA claims must take into account the tax savings that General Foods will realize; and (2) the base indemnity was to be treated as if the claims were outside bankruptcy; therefore, the gross-up was based on a whole dollar basis. Based on the Bankruptcy's rulings, the TIA claims were reduced and allowed as a $20,990,878.92 general unsecured claim.

## LEGAL STANDARD

A bankruptcy court's conclusions of law are reviewed *de novo*. *See In re Heartland Steel, Inc.*, 389 F.3d 741, 743-44 (7th Cir. 2004). The court reviews the bankruptcy court's factual findings for clear error. *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003). The parties agree that the agreements are governed by New York law.

The Court's role in interpreting a contract "is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004). If the parties set forth their agreement in a clear, complete document, the document is to be enforced according to the document's terms. *See Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 198 (2001). When interpreting a contract, contemporaneous agreements that are part of the same transaction should be read together. *See Smith v. Shields Sales Corp.*, 802 N.Y.S2d 764, 765 (2005).

## ANALYSIS

General Foods raises two issues on appeal – whether the Bankruptcy Court erred in (1) not allowing General Foods' tax indemnity claims against United in an amount sufficient to preserve General Foods' Net Economic Return and (2) reducing General Foods' indemnity claims by future

6

tax savings. United raises one issue on appeal – whether the Bankruptcy Court erred in requiring that the "gross-up" provided in the tax indemnity agreements be calculated without regard to the actual tax consequences to General Foods arising from the fractional distribution of General Foods' base indemnity claim under the Reorganized Debtors' confirmed plan of reorganization.[2]

Preservation of General Foods' Net Economic Return

General Foods argues that the Bankruptcy Court's finding that Tax Savings were required to be subtracted from General Foods' TIA claim failed to "maintain" General Foods' "Net Economic Return" as mandated in Section 5(b) of the TIA. General Foods contends that the TIA mandates that Net Economic Returns be maintained and allows Tax Savings to be "taken into account" only to accomplish that result. However, "taken into account" does not mean automatically subtracting any Tax Savings but means that the parties must consider both the tax gains and losses that flow from the Loss and then take them into account as necessary in order to arrive at a lump-sum amount that maintains General Foods' Net Economic Return. In order to "maintain" General Foods' Net Economic Return, there can be no offset for future income taxes that General Foods avoided when those taxes would otherwise have been paid from rental income that General Foods will not now receive because of United's default.

The Bankruptcy Court also rejected this same argument, finding that the reference to the Net Economic Return does not increase the TIA claims beyond the net change in tax consequences but provides a cap on the claim – General Foods cannot receive any sum greater than the Net Economic Return.

---

[2]United voluntarily withdrew a second issue during this appeal.

General Foods' interpretation of Section 5(b) is inconsistent with the purpose of the TIA and is not supported by the plain language of Section 5(b). General Foods' interpretation of Section 5(b) transforms the TIA's purpose from indemnifying General Foods for the loss of certain tax benefits to indemnifying General Foods for the loss of Net Economic Return. This is inconsistent with the parties' manifest intent in the TIA.

Consistent with the parties' stated intention, Section 5(b) of the TIA sets forth the means of calculating the required indemnification – adding the additional taxes payable as a result of the Loss and any interest, additions to tax or penalties associated with such Federal income tax and subtracting (taking into account) any tax savings reasonably expected to be available to General Foods as a result of the Loss. This amount cannot be greater than General Foods' Net Economic Return.

This interpretation is also supported by other provisions of the financing documents. The total damages available under the Lease are defined as Stipulated Loss Value ("SLV"). The SLV includes both the cash flows under the Lease and General Foods' expected tax benefits. However, General Foods assigned all of the cash flows under the Lease as security to the indenture trustee. Therefore, the only part of the SLV that the TIA protects is the net tax consequences. If the TIA indemnity was construed as intending to provide General Foods with more than the net tax consequences, the TIA would erode the cash flows from payments on the Lease securing the equipment notes. This would be inconsistent with the intention and purpose of the financing agreements entered into between the parties as part of this transaction.

General Foods also argues that Section 5(c) of the TIA provides that Tax Savings are not taken into account if United is in default. However, Section 5(c) specifically applies to "Tax Savings

not taken into account under Section 5(b)." Here, Tax Savings were taken into account as provided in 5(b); accordingly, Section 5(c), by its own terms, is not applicable. Furthermore, Section 5(c)'s exclusion of reimbursement of Tax Savings if United is in default does not also apply to Section 5(b). Section 5(c) specifically included the exclusion in case of default; Section 5(b) did not include such an exclusion, and this condition cannot be read into that section.

### Reduction of General Foods' Indemnity Claims for Future Tax Savings

United argues that the Bankruptcy Court erred in "grossing-up" General Foods' claim based on a hypothetical whole dollar basis rather than "grossing-up" General Foods' claim based on what General Foods will actually receive.

Pursuant to Section 5(b), General Foods is entitled to a payment under the TIA for an amount that reimburses General Foods for the change in tax consequences on an "After-Tax Basis." Because the amount General Foods will receive under the TIA is itself taxable, General Foods' claim must be increased, or "grossed-up," in an amount to insure that General Foods is compensated in full for the change in tax consequences. The Bankruptcy Court computed the "gross-up" based on what General Foods would have recovered pursuant to the TIA. However, because of United's bankruptcy, General Foods will not receive the full contemplated amount.

Pursuant to the TIA, United is required to pay General Foods "an amount which, after the deduction of all Federal, state, local and foreign taxes required to be paid by or on behalf of the Owner Participant in respect of the receipt or realization of such amount, is equal *to the payment required to be made* to the Owner Participant under any provision of this Agreement . . . ." (Emphasis added). General Foods (and the Bankruptcy Court) interpreted this section to require the gross-up amount to be calculated on what United would be required to pay General Foods without

9

taking into consideration the bankruptcy, which will result in General Foods' actually receiving and being taxed on an amount lower than that calculated by the TIA. United argues that the claim should be grossed-up based on the anticipated amount General Foods will receive from the bankruptcy distribution, not what would have been due prior to the bankruptcy.

The above-quoted language requires United to reimburse General Foods for all adverse tax liability it suffers as a result of a Loss, including all taxes General Foods is required to pay resulting from the receipt or realization of an indemnity payment from United – the grossed-up amount. The quoted language specifically provides for payment (claim) equal to that which is "required to be paid." Here, the taxes that General Foods will be "required" to pay will be less than what is actually due under the TIA because of United's bankruptcy. The actual amount of taxes General Foods will be required to pay should have been the grossed-up amount awarded by the Bankruptcy Court. General Foods, in arguing to the contrary, fails to consider the full definition of "After-Tax Basis" and ignores the language "after the deduction of all Federal, state, local and foreign taxes *required to be paid* by or on behalf of the Owner Participant in respect of the receipt or realization of such amount." (Emphasis added). Under General Foods' interpretation, General Foods would receive an amount of money based on increased tax liability beyond the actual amount it will be required to pay. This would be inconsistent with the manifest intent of the TIA as it would overcompensate General Foods; which would receive a greater amount of indemnification for tax liability than that which it is required to pay.

United's interpretation is not inconsistent with the Bankruptcy Code, which provides that claims are calculated as of the date of the bankruptcy filing. *See* 11 U.S.C. §§ 365(g), 502(b). Section 502(b) provides that a claim amount is determined as of the date of the filing of the petition.

11 U.S.C. § 502(b). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secure, or unsecured." 11 U.S.C § 101(5)(A). General Foods' claim, as of the petition date, constituted a contingent claim. *See In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (1st Cir. 2000) (party that was signatory of indemnity agreement signed pre-petition had a contingent claim). Pursuant to Section 502, General Foods' claim is to be valued as of the petition date. Interpreting the TIA to allow for reimbursement of taxes based on actual tax consequences is not inconsistent with Section 502 because Section 502 does not prevent the parties from contracting as to how to calculate certain future damages. *See* 11 U.S.C. § 502; *In re Fast*, 318 B.R. 183, 193-94 (Bankr. D. Colo. 2004) (Section 502 does not preclude a claim for fees if fees are provided for by contract).

## CONCLUSION

Based on the foregoing, the July 7, 2006 Order of the Bankruptcy Court is affirmed in part and reversed in part. The matter is remanded to the Bankruptcy Court for further proceedings consistent with this ruling.

Dated: January 22, 2007

JOHN W. DARRAH
United States District Court Judge

11